222 F.2d 692
 Sanford P. WILSON and The Wilson Investment Company, a New
Mexico corporation, Appellants,
v.
C. P. WILLIAMS, Paul S. Williams, Rycade Oil Corporation, a
corporation, and Frank J. Branhisel, Appellees.
C. P. WILLIAMS and Cordelia Pearl Williams, Executrix of the
Estate of Paul S. Williams, deceased, Cross-Appellants,
v.
Sanford P. WILSON and The Wilson Investment Company, a New
Mexico corporation; Rycade Oil Corporation, a
corporation; and Frank J. Barnhisel,
Cross-Appellees.
 Nos. 5031, 5026.
 United States Court of Appeals Tenth Circuit.
 May 13, 1955.
 
 James F. Haning, Wewoka, Okl., for appellants and cross-appellees.
 C. Harold Thweatt, Oklahoma City, Okl. (Embry, Crowe, Tolbert, Boxley & Johnson, Oklahoma City, Okl., was with him on brief), for Rycade Oil Corp.
 A. G. C. Bierer, Jr., Guthrie, Okl. (Bierer & Moser, Guthrie, Okl., and G. O. Wallace, Wewoka, Okl., were with him on the brief), for appellees and cross-appellants.
 Before BRATTON, HUXMAN and PICKETT, Circuit Judges.
 BRATTON, Circuit Judge.
 
 
 1
 This was an action instituted by Sanford P. Wilson and The Wilson Investment Company against C. P. Williams, Paul S. Williams, Rycade Oil Corporation, and Frank J. Barnhisel. Paul S. Williams died during the pendency of the action and the executrix of his estate was substituted party defendant. For convenience, Sanford P. Wilson and The Wilson Investment Company will be referred to as the Wilsons, C. P. Williams and Paul S. Williams as the Williams, Rycade Oil Corporation as Rycade, and Frank J. Barnhisel as Barnhisel.
 
 
 2
 The Wilsons and the Williams entered into a written contract, a copy of which was attached to the complaint. The contract provided among other things that the Wilsons owned an undivided tenacre mineral interest, referred to as the Lowe lease; that they owned the drill site of the first well on such lease; that they owned the lease on another tract, referred to as the Reed lease; and that they owned certain physical equipment located at the drill site of Lowe No. 1 well, consisting of a pump unit, casing, tubing rods, clamps, and other incidental personalty. It further provided that the Wilsons waived and released to the Williams all claim to the Lowe lease; that they would assign to the Williams all their right, title, and interest in the Reed lease; and that they would convey to the Williams by proper mineral deed their title in an to the ten-acre mineral interest; that the Williams would within sixty days commence a well at a location on the acreage received by them by assignment or on the Reed lease, and would drill the well with diligence to the Wilcox sand at the approximate depth of 4,300 feet, unless a paying well were found at a lesser depth; and that they would pay to the Wilsons $3,500, of which $250 was paid upon the execution of the agreement and the balance of $3,250 should be paid upon the execution and delivery of the assignments and the mineral deed. It further provided that the value of the equipment referred to was $20,000; that the Williams were given the right and option at any time within 120 days to secure title and possession of such equipment by paying to the Wilsons $10,000 in cash and executing to the Wilsons a sales contract covering the balance of $10,000, such balance to be paid at the rate of $750 per month; and that until such equipment was fully paid for it should be used only on the block of leases referred to in the agreement. It further provided that in the event the proposed well failed to produce and was abandoned and the Williams had no further need for the equipment, then within sixty days from date of notice, the Wilsons might take possession of such equipment by paying to the Williams the sum of $6,577.76, that being the amount which the Williams had paid to the Ashland Oil & Refining Company; that Barnhisel then held the lien upon such equipment securing that sum; and that upon payment of such sum the Williams would have no further claim or interest in the equipment. And it further provided that the Williams should execute to the Wilsons on oil-payment assignment in the amount of $50,000, payable out of the working interest in the leasehold estates referred to in the agreement.
 
 
 3
 It was alleged in the complaint that the Wilsons had done and performed everything required of them under the agreement; that the Williams exercised their option to purchase such equipment by taking possession of the casing and tubing and using it in the drilling of the Aubrey No. 1 well on a tract of land near the premises described in the contract; that the Williams had failed and refused to pay therefor the $20,000 or any part thereof provided in the contract; and that the Wilsons had filed a lien statement in Seminole County. It was further alleged that to prevent theft, destruction, and deterioration thereof, the Wilsons took possession of the pumping unit, pump, certain rods, and other items of equipment which the Williams had permitted to lie out in the open on the leasehold estates; that with the knowledge, consent, and agreement of the Williams, the Wilsons had sold such property for $6,406.26; and that therefore in the event judgment should be rendered for the Wilsons it should be for $13,593.74. It was further alleged that the Aubrey No. 1 well was finally proved to be a nonproducer and was abandoned; that the Wilsons exercised the option given them in the contract to repurchase the equipment; that the Wilsons were the owners of all equipment described in the agreement; and that the Williams failed and refused to give the Wilsons possession thereof. It was further alleged that the Williams were indebted to the Wilsons in the amount of $20,000, less a credit of $6,577.76 paid by the Williams to the Ashland Oil & Refining Company. And it was further alleged that Rycade claimed some lien, right, title, or interest in and to the casing and tubing which was junior and inferior to the right, title, and interest of the Wilsons. Adapting itself to the facts as thus pleaded, the prayer was in the alternative.
 
 
 4
 By answer, the Williams admitted certain allegations contained in the complaint and denied others. And they pleaded affirmatively that the Wilson Investment Company did not have capacity to bring the action for the reason that it was a foreign corporation doing business in Oklahoma without having been domesticated in that state. And by separate answer, Rycade admitted that some of the casing and tubing referred to in the contract between the Wilsons and the Williams was placed in the Aubrey No. 1 well; and admitted that the Wilsons wrote the letter undertaking to exercise their option to retake possession of the equipment.
 
 
 5
 The court found and determined among other things that the Williams exercised their option to purchase the equipment for $20,000; that thereupon they became indebted to the Wilsons in that amount; that the casing and tubing were subject to a conditional sales lien for the balance of the purchase price from Ashland Oil and Refining Company; that the Williams paid such balance to the Ashland Company; that the lien stood in the name of Barnhisel, who held it for the benefit of the Williams; that the Williams contracted with Rycade to drill a well; that the Williams represented to Rycade that they were entitled to acquire such equipment; that the casing and tubing were used in the drilling of the Aubrey No. 1 well; and that the casing still remained in such well. The court further found that the Wilsons repossessed the surface equipment at the Lowe No. 1 well and sold it privately for $6,406.26; that they took possession of the tubing at the Aubrey No. 1 well and sold it for $2,400; that the Williams were entitled to three credits upon their obligation to the Wilsons in the sum of $20,000, one for $6,406.26 being the amount which the Wilsons received for the property taken from the Lowe well site, one for $2,400 being the amount received for the tubing taken from the Aubrey well and sold, and one for $6,577.76 being the amount of the balance due on the sales lien of the purchase price from the Ashland Company. After allowing the three credits, the balance due on the agreed purchase price of the equipment was $4,615.98. Judgment was entered in favor of the Wilsons against the Williams for that amount, and a lien therefor was established against the balance of the equipment. The Wilsons appealed; and the Williams perfected a cross appeal.
 
 
 6
 The Wilsons challenge the judgment on the ground that the court erred in not rendering judgment in their favor as provided in paragraph 6 of the contract, and for possession of the equipment as provided in paragraphs 7. Paragraph 6 gave to the Williams the option to secure title and possession of the equipment for $20,000, and that option was exercised. Upon the exercise of such option, title to the property vested in the Williams, and the Williams became indebted to the Wilsons in the sum of $20,000. Paragraph 7 vested in the Wilsons the right to take possession of the equipment in the event the proposed well failed to produce and was abandoned and the equipment was not needed for the drilling of other wells on the leasehold estates. And it required the Wilsons, upon the exercise of such right, to pay the Williams the sum of $6,577.76 representing the balance of the purchase price paid to the Ashland Company. It was alleged in the complaint that the Wilsons did exercise their option to repurchase or reacquire the property and that thereupon title vested in them. In their answer, Williams did not admit that allegation. On the contrary, it was denied. The evidence adduced upon the trial is not in the record, and the court did not find that the option of the Wilsons to repurchase or reacquire the property was exercised. In short, the record before us fails to contain any showing that the Wilsons ever repurchased or reacquired the property. While title was in the Williams, the Wilsons sold some of the equipment for $6,406.26; sold some for $2,400; and retained unto themselves the proceeds of both sales. And under the contract as we construe it, the Wilsons were obligated to reimburse the Williams for the balance of the purchase price which the Williams paid to the Ashland Company. But they failed to do that. Based upon clear principles of equity, it seems manifest that the Williams were indebted to the Wilsons in the sum of $20,000; and that the Wilsons were obligated to the Williams in the sums of $6,404.26, $2,400, and $6,577.79, respectively, leaving a net balance due the Wilsons of $4,615.98. To argue that the Williams were not entitled to such credits is neither demonstrable nor realistic.
 
 
 7
 The Wilsons advance the further contention that the court erred in not rendering judgment against Rycade for $10,200. It is argued in support of the contention that Rycade knew of the existence of the contract between the Wilsons and Williams; that with such knowledge it took and used the casing and tubing; that by taking and using such property, Rycade benefited from the contract between the Wilsons and the Williams; and that it thereby rendered itself liable to the Wilsons for the value of such property, established in the contract at $10,200. Rycade was not a party to the contract between the Wilsons and the Williams, and it never expressly obligated itself to pay the Wilsons anything. With knowledge of the existence of the contract, and relying upon the representation of the Williams that they owned and had a right to dispose of the casing and tubing from the Lowe No. 1 well, Rycade received from the Williams some or all of such casing and tubing and used it in the drilling of the Aubrey No. 1 well. But Rycade did not expressly adopt the contract between the Wilsons and the Williams, and it did nothing which constituted an implied obligation to pay the Wilsons the contract value for any part of the equipment. The Wilsons did not seek to recover against Rycade for the reasonable market value of the casing or tubing, or the reasonable value of its use. And there is no suggestion in the record that evidence was introduced tending to establish such value.
 
 
 8
 Coming to the cross appeal, the Williams contend that The Wilson Investment Company was a foreign corporation; that it was not domesticated in Oklahoma; that it was engaging in business in that state; and that it could not maintain the action. Title 18, section 1.201, Oklahoma Statutes 1951, provides in presently material part that a foreign corporation which has engaged in or transacted, or is engaging in or transacting, business within the state, either before it shall have become domesticated or after its certificate of domestication has been cancelled or revoked, shall not be permitted to maintain any action in any court of the state until a certificate of domestication, or another such certificate, as the case may be, has been issued to such corporation. Under the plain command of the statute, a foreign corporation must comply with its provisions as a condition precedent to the maintaining of an action in the curts of Oklahoma. Goodner Krumm Co. v. J. L. Owens Manufacturing Co., 51 Okl. 376, 152 P. 86. And where a foreign corporation is thus barred from maintaining an action in the courts of a state until it has obtained a certificate of domestication, it cannot maintain an action in the United States Court within the state without having obtained such a certificate. Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524. But in order to avail themselves of the bar contained in the statute, it was incumbent upon the Williams to plead and prove that The Wilson Investment Company was a foreign corporation; that it had not been domesticated in Oklahoma; and that it had engaged in or transacted, or was engaging in or transacting, business in that state. Dime Savings & Trust Co. v. Humphreys, 175 Okl. 497, 53 P.2d 665.
 
 
 9
 It was stipulated that the foreign corporation was organized under the laws of New Mexico, and that it had never domesticated in Oklahoma. But it was not stipulated that the corporation had engaged in or transacted, or was engaging in or transacting, business in the state. It appeared from the face of the contract between the Wilsons and the Williams that the corporation owned an interest in the leasehold estates and drilling equipment described in such contract. But the mere taking of title to such property and the passive ownership of it did not constitute engaging in or transacting business in Oklahoma. United States v. Hotchkiss Redwood Co., 9 Cir., 25 F.2d 958; Bruun v. Hanson, 9 Cir., 103 F.2d 685, certiorari denied 308 U.S. 571, 60 S.Ct. 86, 84 L.Ed. 479; Chittim v. Belle Fourche Bentonite Products Co., 60 Wyo. 235, 149 P.2d 142.
 
 
 10
 It also appeared from the contract that the corporation had been a party to a drilling or mining venture in Oklahoma which consisted of the drilling of a well. But engaging in business or transacting business in Oklahoma means the doing or performing of a series of acts which require time, attention, and labor, for the purpose of livelihood, profits, or pleasure; and the doing of a single act of business in the state does not constitute the doing of business there within the intent and meaning of the statute, supra. Fuller v. Allen, 46 Okl. 417, 148 P. 1008; Denison v. Phipps, 87 Okl. 299, 211 P. 83; Barnett v. Aetna Explosives Co., 96 Okl. 132, 220 P. 874; Dime Savings & Trust Co. v. Humphreys, supra; Metal Door & Trim Co. v. Hunt, 170 Okl. 240, 39 P.2d 72, 101 A.L.R. 350; Central Life Assurance Society v. Tiger, 177 Okl. 108, 57 P.2d 1182. The Williams failed to discharge the burden of showing that the foreign corporation had engaged in or transacted, or was engaging in or transacting, business in Oklahoma.
 
 
 11
 The second contention urged on the cross appeal related to the credit of $2,400 for the tubing which the Wilsons sold. It is argued that in a schedule attached to the contract between the Wilsons and the Williams the tubing was listed as having a value of $4,200; and that credit should have been allowed for that amount rather than the amount for which the Wilsons sold it. Almost two years intervened between the date of the contract and the date on which the Wilsons sold the tubing. During that interim, the tubing had been used in the drilling of the Aubrey No. 1 well. And there is no indication in the record that the property was in the same condition or of the same value at the time of the sale that it was at the date of the contract. With time and use, it may have deteriorated in quality with resulting diminution in value. The Williams were entitled to credit for the reasonable market value of the property at the time it was taken and sold, not the value specified in the schedule attached to the contract.
 
 
 12
 The judgment is affirmed.