**RIBLET TRAMWAY COMPANY, Incorporated, Plaintiff-Appellee,**

v.

**MONTE VERDE CORPORATION, and Angel Fire Ski Corporation, Defendants-Appellants.**

**No. 71–1129.**

United States Court of Appeals, Tenth Circuit.

Jan. 7, 1972.

Rehearing Denied Feb. 2, 1972.

Riner E. Deglow, Spokane, Wash. (Thomas B. Catron, III, Santa Fe, N. M., on the brief), for plaintiff-appellee.

Arthur H. Coleman, Santa Fe, N. M., for defendants-appellants.

Before HOLLOWAY and DOYLE, Circuit Judges, and DAUGHERTY, District Judge.

WILLIAM E. DOYLE, Circuit Judge.

Essentially this case is a collection/repossession controversy involving four ski lifts located at the Angel Fire ski resort at the south end of the Moreno Valley

outside of Eagle Nest in northern New Mexico. The lifts were sold by plaintiff, a Spokane, Washington corporation (Riblet), to joint New Mexico corporations (Monte Verde and Angel Fire, hereinafter called defendants) which were then owned in 1966 by the Roy LeBus family, but which were purchased in 1969 by the present owners called the Dresser group. The successive corporate owners are here referred to as the LeBus group and the Dresser group.

The ski lifts were duly installed and some payments were made, especially by the Dresser group, but payments have not been made recently and the present status is a legal stalement made possible by litigation and appellate delay.[1]

The court entered two judgments. The first was an interlocutory one finding the amount of the outstanding indebtedness as of September 30, 1970. It was determined by the judge that there was an additional balance representing the accelerated remaining debt in the amount of $75,083.45. The court did not enter a money judgment on the basis of the finding. Rather, the defendants were granted a short period of time (six days) to bring the obligation into balance. They would have been required to pay $76,912.63 together with the $30,000.00, which sum had been paid into the court as a security amount in relation to the denial of the summary judgment which the plaintiff had requested. Defendants were unable to come up with the $76,912.63, and so on November 12 the court entered its final judgment granting to plaintiff immediate possession of the ski lifts. At the same time, the $30,000.00 security fund was returned to defendants and it is from this judgment that the appeal has been taken.

The record herein shows that the defendants had paid a total of $146,361.55 of a total purchase price in the amount of $278,086.80 exclusive of interest and collection costs.

The defendants seek reversal on the following grounds:

1. That the plaintiff was not authorized under the relevant New Mexico statute to do business in that state, and hence was barred from prosecuting the action in the courts of New Mexico and also in federal court since this is a diversity suit.

2. That the particular installments which were the subject of the alleged default here were paid and received by plaintiff. Thus, the action should have been dismissed (and a new action should have been filed if the plaintiff wished to continue to prosecute the action.)[2]

3. That the part of the judgment which allowed the repossession of the facilities by plaintiff if the defendants failed to meet the revised payment schedule was outside the scope of the pleadings and therefore void.

4. That the trial court committed clear error in construing the contract as calling for the payment of interest annually in addition to the installments provided for in the original and revised agreements with the Dresser group.

The pertinent facts are these:

Riblet prior to the contracts in suit had never transacted business in New Mexico. Its sole office and plant are located in Spokane, and it has not based salesmen in New Mexico nor has it advertised its products there. The initial contact between the parties was through the mails. Subsequently by mail the defendants submitted specifications, and the plaintiffs returned formal proposals. At defendants' request Riblet's president went to New Mexico for an on-site inspection. Thereafter, on May 3, 1966, the parties executed a contract (signed by Riblet in Spokane and then by defendants in New Mexico) for three ski lifts, and, on July 26, 1966, another contract for a fourth lift. The total purchase price was $278,086.80 which was later reduced by $3,195.62 in satis-

---

[1]. Both parties sought to manipulate the litigation for their own tactical advantage.

[2]. The trial court took cognizance of the subsequent defaults and of the obligation as a whole.

faction of claims resulting from deficiencies in the gear reducer mechanisms. By the terms of the contracts title was to remain in Riblet until all amounts were paid.

The machinery and fabricated structural steel were shipped f. o. b. manufacturers plant in Spokane, after which the ski lifts were installed by defendants' own personnel. Riblet personnel made one trip to New Mexico to assist in load tests after construction was completed and two trips to repair faulty gear boxes.

The LeBus group, after making the one percent down payment and payments of $1,914.00 in November 1967, and $35,000.00 in December 1967, was continuously in default to the time the Dresser group took control in July 1969. Two amendments to the contract, involving revised schedules for meeting payments, had been designed at different times (one in 1967 and one in 1968) to assist the LeBus group in remedying their defaults, but were unavailing.

When the Dresser group took control a new agreement was executed by Riblet and the defendants. This agreement stipulated that the balance payable as of July 5, 1969 was $120,760.24, including principal and interest, plus an additional $3,700.00 in collection costs. (This, of course, was arrearage only.) A new schedule for meeting the arrearage was also set forth. The agreement like the original contracts also contained a repossession clause in the event of default in any payment and incorporated all the provisions of the previous contracts and agreements, including the acceleration clause.

An initial $25,000.00 payment was made in July 1969. Soon thereafter defendants requested and received Riblet's concurrence in still another revised payment schedule. Defendants made the payments due in August, September and October 1969. The November and December payments were not made, and Riblet filed suit in late December asking for repossession. On January 14, 1970, defendants paid $35,000.00, which Riblet accepted. This amount brought defendants current under the revised schedule, but Riblet claimed an additional amount for interest on overdue payments and certain collection costs. The February payment was not made. In early March 1970, defendants paid an additional amount which Riblet refused to accept as a payment but rather kept as "rent," though no provision for rent appeared in any of the agreements. Neither the April 1970 payment nor the May balloon payment designed to clear all the arrearage was made. Thus, according to the revised schedule, the total amount due and unpaid as of June when the defendants filed their answer was well in excess of $64,000.00, plus interest (Riblet estimated it as $83,697.79).

### I.

On the date of execution of the present contracts the obtaining of a certificate to transact business in New Mexico was a necessary prerequisite to suit by a foreign corporation upon contracts made by it in the state.[3] This section was superseded in 1967 by a somewhat broader provision adopted from the Model Business Corporation Act, which bars a corporation from maintaining any action

---

3. Every foreign corporation . . . before transacting any business in this state, shall file in the office of the state corporation commission (a certified copy of its charter or certificate of incorporation and a statement of the amount of its authorized stock, the character of its business, the principal office in the state, and its agent for service of process); upon the filing of such copy and statement, the state corporation commission shall issue to such corporation a certificate authorizing it to transact business in this state . . . . § 51–10–4(a) N.M.S.A., 1953 Comp.

Until such corporation so transacting business in this state shall have obtained said certificates from the state corporation commission, it shall not maintain any action in this state, upon any contract made by it in this state . . . . § 51–10–5 N.M.S.A., 1953 Comp.

until it has obtained a certificate of authority.[4]

It is undisputed that Riblet has never been authorized to do business in New Mexico. The question then is whether its failure to do so requires dismissal of the action. In resolving this question we will assume that the contracts were made in New Mexico since Riblet's offer was accepted (signature attached) there by defendants. The contract is executed where the last act necessary to its formation is performed. Don J. Cummings Co. v. Aluminum Manufacturing Corp., 371 F.2d 118, 120 (10th Cir. 1967).

This court, in accordance with Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949), has said that state statutes of the present sort will be given effect in diversity suits when the proper facts are presented. Wilson v. Williams, 222 F.2d 692, 697 (10th Cir. 1955).

Under the New Mexico statutes at issue, contracts made by an unauthorized foreign corporation in the state are not void, rather the corporation is merely prevented from suing until it complies. Niblack v. Seaberg Hotel Co., 42 N.M. 281, 76 P.2d 1156, 1159 (1938). This court need not decide whether the current provision or its predecessor governs here since their impact is identical. It is most probable, nevertheless, that the current provision alone governs the question since suit was filed in 1969, and the statute creates only a temporary disability which can be overcome. In other words, the bar applies when the suit is brought, and can be remedied by complying with the corporate authorization provisions then in force.

Contrary to the contention of the defendants, "transacting business" under the corporate authorization statutes and the "transaction of any business" under the New Mexico long arm statute, as construed in McIntosh v. Navaro Seed Company, 81 N.M. 302, 466 P.2d 868 (1970), are not coterminous or synonymous. Thus, a foreign corporation subject to in personam jurisdiction under the long arm statute is not required by reason of that fact alone to obtain a certificate to do business. This is evident from a comparison of New Mexico cases. We need not, therefore, dwell on the fine distinctions which are applied in cases involving jurisdiction under long arm statutes. The policy, purpose and history of these statutes differ substantially from the considerations applicable to the corporate authorization provisions.

The Supreme Court of New Mexico, dealing with pleas in abatement of the present sort, has said that statutes such as those before us must be strictly construed involving as they do penalties and restrictions on the right to maintain an action which is a favored right and will be curtailed only when the limitation clearly applies.[5]

In New Mexico law this is anything but a clear case for invoking the bar. Riblet's contacts with the state on this and on two other occasions [6] came about only through and were intimately connected with and necessary to the interstate sale of ski lifts. The New Mexico Supreme Court, citing York Manufac-

---

4. No foreign corporation transacting business in this state without a certificate of authority shall be permitted to maintain any action, suit or proceeding in any court of this state, until the corporation has obtained a certificate of authority. . . . § 51–30–19 (A) N.M.S.A., 1953 Comp., Replacement Volume (pocket part). (This section also contains monetary penalty provisions.)

5. The court so stated:
   Since both sections (predecessors to the statutes here at issue) impose penalties they should be strictly construed and their application should be made to clear cases only . . . . the law favors right of action rather than the right of limitation. Any restriction upon the right of action must be applied with caution, and only in clear cases. Transradio Press Service v. Whitmore, 47 N.M. 95, 137 P.2d 309, 311 (1943).

6. After the present sale Riblet made two similar sales—one to the Los Alamos Ski Club and the other to the Sandia Peak Corporation.

turing Co. v. Colley, 247 U.S. 21, 38 S.Ct. 430, 62 L.Ed. 963 (1918), has repeatedly indicated that the making of a sale which is primarily interstate in nature does not of itself subject the corporation to the state's certification provisions. *See* Abner Manufacturing Co. v. McLaughlin, 41 N.M. 97, 64 P.2d 387 (1937); Cessna Finance Corp. v. Mesilla Valley Flying Service, 81 N.M. 10, 462 P.2d 144, 147 (1969).

■ Defendants have not cited any New Mexico cases where a litigant seeking to invoke the bar against a foreign corporation has been successful on appeal. The overwhelming majority of the cases may be said to turn on the fact that the contracts considered there were executed outside the state. Nevertheless, our research discloses no cases which actually consider the sole act of accepting an offer in New Mexico as enough to require certification. On the contrary, it appears that the matter turns on the nature and quantity of the contacts.[7]

*Abner Manufacturing, supra,* involved an Ohio corporation which had sold fifty to seventy-five lighting systems through a New Mexico agent whose function was to solicit orders. The same agent took possession of the purchaser's promissory note in New Mexico. The combination of soliciting business and contracting in regard to the indebtedness was not considered enough to bar the Ohio corporation from maintaining suit.

Access to the courts was also allowed in *Cessna, supra,* where a foreign subsidiary of the Cessna Corporation had as its only business the financing of airplanes sold by Cessna dealers in New Mexico and to that end was creating liens on personal property in New Mexico.

The court held that securing or collecting debts or enforcing rights in property securing them did not constitute transacting business in the state for the purpose of the certification provisions.

■ Here Riblet's only contacts with New Mexico revolved around the interstate sale of ski lifts and efforts to secure and collect its debt through the conditional sales device. Under the applicable New Mexico law the trial court's ruling refusing to disallow access to the courts was clearly correct.

## II.

The defendants' contention that the payment and receipt of the November and December 1969 installments effectively ended the lawsuit since these defaults had triggered the filing of the action is without merit. Where as in this case the collection effort is a lengthy siege and each payment is an ordeal, we must look at the total controversy rather than any single facet.

■ There were defaults subsequent to those which were remedied. Defendants' claim that Riblet's invocation of the acceleration and repossession clauses of the contract rested on the two defaults and that their cure required dismissal of the action is insubstantial and must be rejected. The subsequent defaults came to light in the reply to defendants' answer and counterclaim sufficiently to give notice that Riblet claimed, on the basis of subsequent defaults, the relief it had originally requested, namely acceleration and repossession. The test of adequacy of pleadings is whether the adversary has sufficient notice of the pleader's claim so that he can prepare his responsive pleadings or

---

7. The performance of isolated intrastate acts is not enough. *See* Silversmith v. Keeter, 72 N.M. 246, 382 P.2d 720, 723 (1970). In construing Arizona provisions identical in impact to those here, the New Mexico Supreme Court found that the burden was on defendants to show that the foreign corporation conducted " 'some substantial part of its business and not merely a single act' " within

the state. Heller v. Stephens, 79 N.M. 74, 439 P.2d 723, 727 (1968), *quoting from* Monaghan & Murphy Bank v. Davis, 27 Ariz. 532, 234 P. 818, 819 (1925). This is also the law of Oklahoma. See Wilson v. Williams, 222 F.2d 692, 697 (10th Cir. 1955). There is every indication that this is the law of New Mexico also. See Silversmith v. Keeter, supra.

prepare for trial. Clyde v. Broderick, 144 F.2d 348, 350 (10th Cir. 1944).

■ Defendants' further assertion that the judge was powerless to fashion a remedy giving defendants a further chance to redeem, before repossession would be effective in favor of Riblet, is equally insubstantial. In an action such as this the judge has broad equitable powers in designing his judgment.

The additional argument of defendants that the court erred in finding that they were required under the contracts to pay interest annually in addition to semi-annual payments of principal is at this stage somewhat academic since the defendants were, as we have indicated above, in default in any event. Nevertheless, as we view it, the terms of the contracts lent themselves to the construction in this regard that the trial court gave it. There was evidence presented from which it could determine the intent of the parties, and we see no basis for holding that this was a clearly erroneous construction.

### III.

■ We have no fault to find with the trial court's judgment as far as it went. As we interpret the formal judgment, the holding was that the defendants were in default and that the plaintiff was entitled to repossession of the equipment and facilities. Undoubtedly the default did give rise to the right of repossession. However, there is a risk of inequity present resulting from retention by plaintiff of the payments made and at the same time revesting of the security.

The matter is governed, as we view it, by the New Mexico Commercial Code, which is derived from the Uniform Commercial Code, since this transaction involved a sale of goods as defined by § 50A–2–105(1), N.M.S.A., 1953 Comp., Replacement Volume. The use of the conditional sale device or method gave to the seller a security interest in the property in accordance with §§ 50A–9–102(1) (a) and (2) and 50A–9–103(2).

Under § 50A–9–503 the secured party is entitled to take possession of the property either through court action or privately if this can be done without a breach of the peace. In the alternative, the secured party may reduce his claim to judgment and execute upon the collateral, or otherwise satisfy the debt by resorting to state law other than the Commercial Code. See § 50A–9–501(1) and (5).

In the case at bar Riblet did not seek to obtain a money judgment, but instead apparently sought to gain possession of the collateral so as to satisfy the debt. This is apparent not only from the pleadings but also from the judgment of the court.

§ 50A–9–504, as amended in 1971, deals with the secured party's right to dispose of the collateral on default.[8] The sale

---

8. This section provides as follows:

50A–9–504. Secured party's right to dispose of collateral after default—Effect of disposition.—(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. Any sale of goods is subject to the article on Sales (Article 2). The proceeds of disposition shall be applied in the order following to:
(a) the reasonable expenses of retaking, holding, preparing for sale, selling and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorney's fees and legal expenses incurred by the secured party;
(b) the satisfaction of indebtedness secured by the security interest under which the disposition is made;
(c) the satisfaction of indebtedness secured by any subordinate security interest in the collateral if written notification of demand therefor is received before distribution of the proceeds is completed. If requested by the secured party, the holder of a subordinate security interest must seasonably furnish reasonable proof of his interest, and unless he does so, the secured party need not comply with his demand.
(2) If the security interest secures an indebtedness, the secured party must ac-

may be either public or private. But there is a requirement that it be a commercially reasonable sale.[9]

The Official Commentary to the noted section suggests that the private sale is often more productive than a public one, and thus the party is generally permitted to choose the type of sale more reasonable in the circumstances. Official Commentary to § 9–504, 3 Uniform Laws Annotated, Uniform Commercial Code 329 (West 1968). Reasonable notification has to be given to the debtor and any other person having a security interest in the collateral. See Old Colony Trust Company v. Penrose Industries Corp., *supra*. Moreover, the debtor has a right under § 50A–9–506 to redeem the collateral prior to its sale.

In view of the matters noted, the district court is directed to retain jurisdiction of this cause for the purpose of supervising the disposition of the ski facilities in question and the satisfaction of the outstanding indebtedness. Having given extensive effort to the case, the desirability of retaining jurisdiction over it for the purpose of insuring fair and equitable final disposition is apparent.

Accordingly, the judgment is substantially affirmed, but is modified as noted. The cause is remanded for further proceedings and for modification and supplement of the judgment in accordance with the view expressed herein.

count to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency, except, a debtor is not liable for any deficiency where the collateral involved is consumer goods. But if the underlying transaction was a sale of accounts, contract rights, or chattel paper, the debtor is entitled to any surplus or is liable for any deficiency only if the security agreement so provides.

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or who is known by the secured party to have a security interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale. * * *

9. Old Colony Trust Company v. Penrose Industries Corp., 280 F.Supp. 698, 712–714 (E.D.Pa.1968).