**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SSMC, INCORPORATED, N.V.,
Plaintiff-Appellee,

v.

TERRI STEFFEN,
Defendant-Appellant,

SINGER FURNITURE ACQUISITION
CORPORATION,
Defendant & Third Party
Plaintiff-Appellant,

and

SINGER FURNITURE COMPANY; DENNIS

AMMONS; CHARLES SHAUGHNESSY;
WILLIAM JOHNSON; EUGENE
MATTHEWS; WILLIAM FOSTER; JOHN
DOES I-XX,
Defendants,

v.

JAMES TING; PHILIP WATSON; SEMI-
TECH GLOBAL, LIMITED (Bermuda);
INTERNATIONAL SEMI-TECH
MICROELECTRONICS, INCORPORATED;
SHINWA COMPANY, LIMITED,
Third-Party Defendants.

No. 95-3054

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Jackson L. Kiser, Chief District Judge.
(CA-93-952-R)

Argued: October 31, 1996

Decided: December 13, 1996

Before WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Williams and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** William Beverly Poff, WOODS, ROGERS & HAZLE-GROVE, P.L.C., Roanoke, Virginia, for Appellants. John Lawrence Gardiner, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, New York, New York, for Appellee. **ON BRIEF:** Frank K. Friedman, Sara Bugbee Winn, WOODS, ROGERS & HAZLEGROVE, P.L.C., Roanoke, Virginia, for Appellants. Lea Haber Kuck, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, New York, New York; Dennis P. Brumberg, BRUMBERG, MACKEY & WALL, P.L.C., Roanoke, Virginia, for Appellee.

_____

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

This case arises from one aspect of the complex commercial transactions entered into by two sophisticated businessmen, Paul Bilzerian and James Ting. The parties have presented us with massive filings detailing their interwoven financial interests. For purposes of this appeal, however, we set forth only those facts necessary to determine the issues presented.

I.

James Ting (Ting) is the chairman, president, and chief executive officer of Semi-Tech Microelectronics (Far East) Limited (STM).

During the period relevant to this case, SSMC, Inc., a Delaware corporation, and its successor, SSMC, Inc. N.V., a Netherlands Antilles corporation, were Ting-controlled entities. Ting, through STM, also owned all of the common stock of the Singer Furniture Company, a Delaware company (SFC(Del.)) engaged in manufacturing furniture bearing the Singer trademark.

In May 1989, STM agreed to sell SFC(Del.) to the Singer Furniture Acquisition Company (SFAC). SFAC was controlled by Paul Bilzerian (Bilzerian) and his wife, Terri Steffen (Steffen). To effect this sale, SSMC and SFAC entered into a Share Purchase Agreement. Under this Agreement, SSMC agreed to sell all of the common stock of SFC(Del.) to SFAC. On August 2, 1989, SFAC financed the transaction by issuing a Promissory Note in the amount of $44.6 million in favor of SSMC. That Promissory Note was secured by a Stock Pledge Agreement in which SFAC pledged all of the then-issued shares of SFC(Del.), as well as "all additional shares of stock." The Stock Pledge Agreement also provided that SFAC would not "sell or otherwise dispose of, or grant any option with respect to, any of the Pledged Collateral." Consistent with the security interest created by the Agreement, SSMC held the only existing stock certificate for SFC(Del.).

Under the terms of the Promissory Note, SFAC was to pay SSMC the entire $44.6 million by March 31, 1990. However, on May 14, 1990, the parties agreed to refinance the Note. Under the Refinancing Agreement, SFAC would pay $25 million of outstanding debt at a "First Closing," occurring on the day of the Agreement, May 14, 1990. The remaining balance was to be split into two notes: the original Promissory Note, amended to reflect a reduced value of $15 million; and a Contingent Promissory Note worth $4.6 million. The Refinancing Agreement further stated that:

> The Old Note shall become immediately due and payable, at the option of the holder, in the event that: (i) less than 51% of the aggregate of the equity securities (including securities exercisable or convertible into equity securities) of SFC or of the voting securities of SFC shall be owned of record and beneficially by SFAC; or (ii) all or a majority of

3

the assets of SFC shall be sold or a merger or consolidation of SFAC or SFC shall occur.

The Refinancing Agreement also provided that a "Second Closing" would occur, unless agreed otherwise, on the fifth business day following the "Effective Date of the Settlement Agreement."

The "Settlement Agreement" involved an accord among two Bilzerian-controlled entities, Bicoastal Corporation and Bicoastal Royalties Corporation, and the Ting-controlled STM and SSMC. This Agreement, as subsequently amended, resolved some outstanding disputes between the parties subsequent to Bicoastal's bankruptcy filing. The Agreement addressed the obligations of the parties arising under previous accords, including a royalties agreement.

Pursuant to the Refinancing Agreement, if the Second Closing had occurred, the Promissory Note would have been cancelled and replaced by two Subordinated Notes in the aggregate amount of $15 million. SFAC also would have been released from its obligations under the Stock Pledge Agreement. But, if no Second Closing occurred, the Refinancing Agreement provided that the Promissory Note would be due on August 14, 1993.

The First Closing occurred on schedule in May 1990 and the principal amount of the Note was reduced to $15 million. But the Settlement Agreement, the prerequisite for a Second Closing, never became effective. SFAC contends this was due to SSMC's"lack of good faith efforts" to obtain bank approval as required in the Settlement Agreement. Brief of Appellants at 29. Regardless of the reason, with no "Effective Date of the Settlement Agreement," the Second Closing under the Refinancing Agreement never occurred. As a result, SFAC was not released from its obligations under the original Promissory Note.

In the fall of 1991, the board of SFC(Del.), consisting of Bilzerian and Steffen, formed a subsidiary, Singer Furniture Company of Virginia (SFC(Va.)). Bilzerian and Steffen became board members of that subsidiary. After merging SFC(Del.) into SFC(Va.), they dissolved SFC(Del.). Although SSMC was the record owner of, and held a valid stock certificate for, all of the outstanding SFC(Del.) stock,

4

and despite the fact that SFAC had pledged not to dispose of the collateral under the Stock Pledge Agreement, SFAC exchanged the pledged shares for 4,000,000 shares of SFC(Va.) stock. The SFC(Va.) board, consisting of Steffen and Bilzerian, then voted to redeem 3,900,000 of these 4,000,000 shares held by SFAC. A new share certificate was issued to SFAC for 100,000 shares. SFC(Va.) subsequently redeemed these shares and issued new shares in the name of individual members of the Board of Directors of SFC(Va.). When all transactions were completed, reportedly 84 percent of the stock was held by Steffen, and SSMC's security interest was eliminated.

Because the Second Closing never occurred, SFAC still owed $15 million to SSMC on the $44.6 million Promissory Note, due on August 14, 1993. SSMC was also entitled to interest on the $15 million as provided in § 5.2(b) of the Refinancing Agreement, and in the Promissory Note. In August 1993, SFAC did not pay SSMC the remaining $15 million plus interest. SSMC demanded payment, as well as financial information. SFAC supplied financial reports that revealed the merger and the elimination of SSMC's security interest in SFC(Del.). Shortly thereafter, in December 1993, SSMC filed this action, based on diversity of citizenship against SFAC, Terri Steffen, and various other officers of SFC (Va.). SSMC alleged that, by means of the above transactions, SFAC committed fraud, breach of contract, unjust enrichment, tortious interference with contract, conversion, and conspiracy. All allegations, save breach of contract, were also lodged against Steffen. SSMC sought injunctive and declaratory relief, compensatory damages in the amount of "at least $15 million dollars," punitive damages, and attorney's fees.

On May 3, 1995, SFAC notified the district court that it had filed a Chapter 11 petition in the bankruptcy court for the Middle District of Florida. After a pretrial conference, on May 4, 1995, the district court issued an order declaring the merger of SFC(Del.) with SFC(Va.) a "legal nullity." It also declared that SFC(Del.) still existed, and that all shares of SFC(Del.) belonged to SSMC. In response to SSMC's request, on May 5, 1995, the court issued a temporary restraining order preventing Steffen from placing SFC(Va.) in bankruptcy.

Subsequently, SFAC wrote a letter to the court indicating what it believed to be errors in the May order. In August 1995, SSMC

5

responded with its own letter, which set forth its proposal as to how to resolve outstanding issues. SFAC did not respond to that letter. On September 1, 1995, the district court held a status conference on the case. At that conference, SSMC requested that the court enter an order granting SSMC summary judgment against SFAC on the claim of breach of the Stock Pledge Agreement and the Promissory Note, and against Steffen on the conversion claim. Additionally, SSMC stated that, as its sole remedy for all claims set forth in its Complaint, it was willing to accept an injunction and declaration that it owned all SFC(Del.) stock. In response, SFAC indicated that although it objected to the court's May rulings and reserved those objections, it offered no objection to SSMC's proposed implementation of the court's May rulings.

On October 30, 1995, the district court entered a final order, concluding the case as SSMC had proposed. The court granted SSMC summary judgment against SFAC on the claims of breach of the Promissory Note and Stock Pledge Agreement and against Steffen on the conversion claim. The court declared: (1) the attempted merger of SFC(Del.) into SFC(Va.) was a legal nullity; (2) SSMC was the legal and beneficial owner of SFC(Del.); and (3) the shares of SFC(Va.) issued to Steffen were null and void. The court also dismissed SFAC's compulsory counterclaim.

On appeal, appellants raise a number of issues. We address each in turn.

II.

SFAC and Steffen maintain that the district court's decision conflicts with the Uniform Commercial Code (U.C.C.). Specifically, they maintain that in holding SSMC to be the owner of SFC(Del.), the district court violated Article 9 of the U.C.C. by permitting SSMC "to have the benefit of a `foreclosure' . . . without complying with the requirements" of Article 9. Brief of Appellants at 24. At oral argument before us, SFAC presented a variation of this claim, asserting that even if the remedy imposed by the district court did not violate the letter of Article 9, it violated its spirit, because SFAC had no notice of this remedy. We reject both contentions.

6

A.

SFAC asserts that the district court could not declare SSMC the owner of SFC(Del.) because this remedy is not found in, or sanctioned, by Article 9 of the U.C.C., which governs enforcement of security interests. Specifically, SFAC contends that the district court should have limited its remedy to one permitted by the U.C.C., as interpreted in New York (the choice of law set forth in the Stock Pledge Agreement).

However, as the Supreme Court noted long ago: "[s]tate law cannot define the remedies which a federal court must give simply because a federal court in diversity jurisdiction is available as an alternative tribunal to the State's courts." Guaranty Trust Co. v. York, 326 U.S. 99, 106 (1945). Moreover, a court's equitable powers can extend to setting aside or enjoining the enforcement of rights purportedly created by a tainted transaction. See, e.g., Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385 (1970).

There are several other difficulties with SFAC's argument. First, SSMC did not merely seek to enforce a security interest. Instead, SSMC pursued eleven causes of action against SFAC, Steffen, and the other defendants, including non-Article 9 claims such as conversion and unjust enrichment. Although SSMC also brought a claim for breach of contract on the Stock Pledge Agreement, it did not limit its remedies to Article 9. Indeed, although SSMC ultimately confined its request to equitable relief and received only equitable relief, it originally sought compensatory and punitive damages as well as the equitable relief.

Even if SSMC had proceeded solely on the basis of its security interest under Article 9, the U.C.C. would not prevent SSMC from pursuing other remedies. Section 9-501(1) of the U.C.C., which sets forth default procedures, clearly provides that a debtor "may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure." U.C.C. § 9-501 (1972). This provision does not exclude non-Code remedies. See Ronald A. Anderson, 9A The Uniform Commercial Code§ 9-501:37 (3rd ed. rev. vol. 1994) (noting that "[t]he remedies given the creditor by [Article 9 of] the Code do not exclude non-Code remedies"); 68A

7

Am. Jur. 2d, Secured Transactions, § 574 (1993) (same); National Bank of South Carolina v. Daniels, 322 S.E.2d 689, 691 (S.C. Ct. App. 1984) (stating that "pre-Code remedies are still available to the secured party" who seeks to move against collateral in the event of default).

In fact, since Article 9 creates no substantive cause of action in favor of the secured party, that party must turn elsewhere to determine what remedies are available other than foreclosing or securing a judgment. See U.C.C. § 9-501(1); 68A Am. Jur. 2d § 574. In this respect, Article 9 remedies are cumulative to remedies otherwise available to the secured party. U.C.C. § 9-501(1); 68A Am. Jur. 2d § 575. This approach is also consistent with the treatment of remedies in other portions of the Code. See, e.g., U.C.C.§ 2-719, comment 2 (1977). (The provision on available remedies "creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed.").

Although a secured party may agree to limit its recourse to certain remedies, see U.C.C. § 9-501(3), SSMC agreed to no such limitation in its agreement with SFAC. Rather, the Stock Pledge Agreement states:

> The Pledgee may exercise in respect of the Pledged Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the Uniform Commercial Code (the "Code") in effect in the State of New York at that time.

(emphasis added). When a creditor such as SSMC does not agree to waive its non-U.C.C. remedies, it retains those remedies. U.C.C. § 9-501(1).

Moreover, a federal court's power to enforce a security interest under Article 9 of the U.C.C. with an equitable remedy is well established. See, e.g., Riblet Tramway Co. v. Monte Verde Corp., 453 F.2d 313, 319 (10th Cir. 1972) (finding that in a repossession action enforcing a security interest, "the judge has broad equitable powers

8

in designing his judgment"); <u>Bookout v. Atlas Fin. Corp.</u>, 395 F. Supp. 1338, 1339-40 (N.D. Ga. 1974) (In a diversity action to recover for alleged defaults on notes issued as part of a reinsurance agreement, the court found it within its powers to adjudicate an action which was "primarily an effort to envoke [sic] the equitable jurisdiction of [the] court to enforce certain security agreements executed to secure payment of the notes."), <u>aff'd</u>, 514 F.2d 757 (5th Cir. 1975).**1**

Thus, the district court did not err in adopting an equitable remedy that was not specifically set forth in the Uniform Commercial Code.

B.

At oral argument before us, SFAC virtually conceded that the U.C.C. did not prohibit the district court from imposing the remedy it chose, but SFAC then pressed a related argument. It asserted that it was not given notice that the district court intended to allow SSMC to take possession of SFC(Del.). According to SFAC, for this reason, the district court's order was at odds with the spirit of the U.C.C.

This argument ignores the facts in this case, which demonstrate that substantial notice of the proposed remedy was provided to SFAC. The district court issued its order and memorandum opinion in early May of 1995. Thus, from that time until the final order was issued on October 30, 1995, almost six months later, SFAC was on notice regarding the court's intended action. Moreover, in an August 1995 letter, SSMC set forth its proposed relief. SFAC could have opposed the proposed relief in writing or at the September 1 status conference. Instead, when specifically asked for its views by the court at that status conference, SFAC did not dispute the resolution proposed in SSMC's August letter but rather stated "the matters set forth in the

_____

**1** The very cases on which SFAC relies are in accord with these principles. <u>See, e.g.</u>, <u>MTI Sys. Corp. v. Hatziemanual</u>, 542 N.Y.S.2d 710 (1989) (The court discussed how a lender, consistent with Article 9, can retain the collateral in satisfaction of a debt, but never stated that only U.C.C. remedies apply.); <u>Monroe Capital Corp. v. Pom-Pom Lunch & Restaurant, Inc.</u>, 1967 WL 8835 (N.Y. Sup. Ct. 1967) (The security agreement specifically provided that remedies on default were limited to those provided for in the U.C.C.).

letter were an accurate reflection of the matters that yet remain." Although SFAC maintained that it should not have been divested of its SFC(Del.) stock, it never suggested that the district court should hold a hearing to determine the value of the SFC(Del.) stock.

Thus, despite SFAC's notice of the court's intended action in the court below, SFAC never asked that the court assess the value of SFC(Del.), nor maintained that the court erred in failing to make such an assessment. Barring exceptional circumstances,"questions not raised and properly preserved in the trial forum will not be noticed on appeal." Skippy, Inc. v. CPC Int'l, Inc., 674 F.2d 209, 215 (4th Cir.), cert. denied, 459 U.S. 969 (1982). No exceptional circumstances are suggested here.

Even if we were to find SFAC's argument properly preserved for appellate review, we would conclude that it is doomed by appellants' own admissions. Bilzerian testified in deposition that as of 1991 the stock of SFC was worthless. In response to this testimony, SFAC now asserts that the value of SFC as of 1991 is irrelevant to any determination of its value at the time of the district court's order in 1995. However, Steffen's deposition testimony forecloses this argument. She testified that SFC was losing millions of dollars in 1994, the last period for which any records were available. Having proclaimed that SFC was worthless and unprofitable in 1991 and 1994, appellants cannot now assert that the district court erred in not assessing the Company's value, particularly when they never requested such a valuation.

III.

SFAC briefly asserts that if this case is not remanded for a valuation hearing, the district court's order should be deemed a recision ab initio of the transaction in which SFC(Del.) was sold to SFAC. According to SFAC, the district court actually voided "the $44.6 million note . . . for lack of consideration," and so "the $25 million which SSMC received from the `First Closing' was wrongly received and should be returned to SFAC." Brief of Appellants at 27-28.

The sheer audacity of this argument is breathtaking. Its merit does not, however, match that audacity. SFAC is entitled to no refund

10

because: (1) the district court did not rescind the original sale and (2) SSMC did not wrongly receive $25 million.

STM agreed to sell SFC(Del.) to SFAC for $44.6 million. In payment, SFAC gave SSMC a promissory note for this amount and pledged all of the stock of SFC(Del.) to SSMC. When SFAC was unable to pay the entire sum when due, the parties agreed to refinance the note. As part of this refinancing, SFC caused SFC(Del.) to borrow $25 million to pay SSMC. This borrowing, of course, diminished the value of SSMC's collateral. SSMC never received any payment from any source on the $15 million due on the $44.6 million note. Instead, when according to Bilzerian, SFC(Del.) was worthless, Bilzerian and Steffen merged this entity into SFC(Va.), and eliminated SSMC's security interest in the stock. Then SFAC, Bilzerian, and Steffen caused SFC to pay hundreds of thousands of dollars in salary and bonuses to Steffen, although the company was losing money.

In light of these undisputed facts, the district court hardly erred in refusing to order SSMC to pay SFAC $25 million.

IV.

SFAC next claims that the district court erred in determining that the Second Closing had not occurred. If the Second Closing had occurred, the original Promissory Note would no longer have been valid, and there would have been no SSMC security interest in SFC stock. SFAC contends that a reasonable jury could have concluded that the Second Closing did occur.

The basis for this assertion is SFAC's allegation that the Second Closing did not occur because of SSMC's fraud. Specifically, SFAC maintains that the Settlement Agreement, and the subsequent Amendment to the Settlement Agreement, never were implemented because the Amendment required approval from STM's (SSMC's parent company) banks, and STM never sought such approval. Brief of Appellants at 16. SFAC argues that because SSMC's nonperformance "contributes materially to the non-occurrence of a condition of one of [SSMC's] duties, the non-occurrence is excused." Id. at 31 (citing Restatement (Second) of Contracts § 245). In other words, since SSMC assertedly breached its good faith obligations to obtain bank

11

approval, and as a result, the Second Closing did not occur, SFAC maintains that it was allowed to proceed as if bank approval were obtained and the Second Closing had occurred.

The argument is meritless. STM's asserted fraud may provide the other partners to the Settlement Agreement, Bicoastal Corporation and Bicoastal Royalties Corporation, with a breach of contract claim under the Settlement Agreement against STM.**2** However, STM's asserted fraudulent refusal to implement the Settlement Agreement does not create a Second Closing when none ever occurred. In deposition, Bilzerian and other SFAC executives admitted that the Second Closing never occurred. At oral argument, SFAC's counsel also conceded that the Second Closing did not occur.

The district court did not err in treating as undisputed the fact that the Second Closing did not occur.

V.

SFAC also contends that the district court erred in determining that Steffen converted stock of the newly created SFC(Va.). SFAC argues that Steffen could not be guilty of converting SFC(Va.) stock because the district court found that the attempted merger of SFC(Del.) with SFC(Va.) was a "legal nullity." Since the stock of SFC(Va.) was void as a matter of law, according to SFAC, Steffen could not have been held liable for converting it.

SFAC mischaracterizes the district court's holding. The court did not find that Steffen had converted SFC(Va.) stock. Rather, it found that "defendant Terri Steffen converted SSMC's interest in Singer Furniture Company, A Delaware corporation." The court never suggested that SFC(Del.) was a "legal nullity."

_____

**2** SFAC itself cannot obtain any relief under the Settlement Agreement because SFAC was neither a third party beneficiary to the Settlement Agreement, nor a successor in interest to one of the signing parties. Bilzerian stated in his deposition that Bicoastal's parent company, BPLP 1, sold SFAC in 1990.

Nor was there any error in the court's ruling that Steffen converted the stock of SFC(Del.). Under Virginia law, a conversion is defined as:

> [A]ny wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession;[and any] act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it.

United Leasing Corp. v. Thrift Ins. Corp., 440 S.E.2d 902, 905 (Va. 1994) (quoting Universal C.I.T. Credit Corp. v. Kaplan, 92 S.E.2d 359, 365 (Va. 1956)). A "pledgee cannot be deprived of [its] security by the substitution of other stock for that pledged without [its] consent" and if it is, it may sue for the conversion of the pledged stock. See 12A William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations §§ 5645, 5651 (perm. ed. rev. vol. 1993). That Steffen, without SSMC's knowledge, purported to merge all the stock of SFC(Del.) into SFC(Va.) and eliminate SSMC's security interest which was held in 100% of the SFC(Del.) stock, is undisputed. Those uncontroverted facts provided a sound basis for the district court's conclusion that Steffen converted SSMC's interest in the SFC(Del.) stock.

VI.

Finally, SFAC asserts that the district court erred in its ruling regarding SFAC's amended counterclaim. SFAC itself moved to dismiss its counterclaim so it does not complain about the dismissal per se. But SFAC does contend that the court's ruling that SFAC's counterclaim was compulsory had the effect of a dismissal with prejudice, and so the court's dismissal of the counterclaim, without prior notice, was error. See Fed. R. Civ. P. 41(a)(1); Andes v. Versant Corp., 788 F.2d 1033 (4th Cir. 1986). This argument too is meritless.

SFAC had notice of the court's intended action; at the status conference, the court discussed the fact that it proposed to dismiss the counterclaim. The court indicated that it was dismissing the counterclaim without prejudice but noted that since SFAC's claim was a compulsory counterclaim, it had to be pursued in this case. SFAC's attorney did not object to this characterization of SFAC's counter-

claim or this legal analysis of the effect of dismissal of a compulsory counterclaim. This may be because in two earlier pleadings, SFAC itself had asserted its counterclaim was compulsory. Given that SFAC's counterclaim was, as it repeatedly stated, compulsory, the district court was correct in concluding that "a dismissal without prejudice [would] have the same effect as a dismissal with prejudice." See Fed. R. Civ. P. 13(a) advisory committee's note (stating that "[i]f the action proceeds to judgment without the interposition of a counterclaim as required by [the rule on compulsory counterclaims], the counterclaim is barred").

VII.

For all of these reasons, the district court's order is in all respects

AFFIRMED.

14