David L. DOOLEY, Plaintiff in Error,

v.

Claire K. Hall CORDES, Samuel Earl Hall, Richard Lee Hall, Jerry Elmer Hall, a Minor, by his Mother, Claire K. Hall Cordes as Next Friend, Claire K. Hall Cordes, Executrix of the Estate of Elmer Hall, Deceased, and Texaco, Inc., a Corporation, Defendants in Error.

No. 40955.

Supreme Court of Oklahoma.

Oct. 3, 1967.

Howell & Stinchecum, Oklahoma City, for plaintiff in error.

Philip R. Wimbish, Elmer W. Adams, Tulsa, for defendants in error.

BLACKBIRD, Justice:

This case is a sequel to Panhandle Eastern Pipe Line Co. v. Isaacson (10th Cir.) 255 F.2d 669; and many of the facts stated in the cited opinion, promulgated May 7, 1958, form a part of the factual background of this case.

There the court upheld the title of M. E. Isaacson, sole surviving trustee of the Mary Phyllis Neal Trust to a term mineral interest, to which he had succeeded, that was created in a reservation by the grantors in a special warranty deed executed and delivered on August 13, 1941, by O. F. Neal and Marie O. Neal, his wife, to one Elmer Hall (thereafter deceased) and describing lands in the Eastern portion of Section 21, and other land in Section 22, Township 6 North, Range 22 East of the Cimarron Meridian in Beaver County, Oklahoma.

Against the claims of Elmer Hall's heirs (and/or their representatives, or the parties deriving their claimed title through them) that the deed reservation's primary 15-year term had expired before the "production", referred to in said reservation, had occurred, the court there held that the "tapping" of a natural gas common source of supply in the lower Morrow Sand by the drilling and completion of a well called the "No. 1 Kiser", on a lease owned by United Producing Company (a stranger to that action), covering other land in Section 22, extended said reservation beyond its primary term, and into an indefinite secondary term, under its "thereafter" provisions, in view of the circumstances there shown, including the entry of a Corporation Commission order well spacing and communitizing all of the land in Section 22, into one drilling and spacing unit.

.After the promulgation of the above described opinion in Isaacson, supra, up-

holding his title, Howard C. Johnson, in early June, 1958, assigned an undivided one-fourth interest in his lease to each of three persons, one of whom was David L. Dooley, the plaintiff in error herein.

Thereafter, in October, 1959, production ceased in the No. 1 Kiser well, on the strength of whose character as a "producer", the court, through Isaacson, supra, had, as aforesaid, held Isaacson's term mineral interest, and Johnson's lease from him, to be extended and/or subsisting.

Less than a year later, The Texas Company, hereinafter referred to as "Texaco", which (as revealed in Isaacson, supra) had, in September, 1955, obtained from the Elmer Hall heirs one lease on their undivided ¾ths mineral interest in the SE¼ of Section 21, supra, for a primary term, evidently of only five years, and which, later in February, 1956, in apparent anticipation of Isaacson's mineral interest expiring at the end of its 15-year primary term on August 13, 1956, obtained, from the same lessors, another such lease—to commence that date—on an additional, or the remaining, undivided one-fourth mineral interest in the same land, began to make plans for the drilling of an exploratory well on said quarter section, presumably to forestall its said leases from expiring at the end of their primary terms.

In fulfillment of its plans, Texaco was instrumental in forming what was called the "C. K. Hall Unit" for the purpose of drilling and operating such a well, referred to as the "C. K. Hall Unit Well", on said quarter section. This was followed by Texaco's obtaining the execution, by other lease owners in said section, of the "C. K. Hall Unit Operating Agreement", dated September 1, 1960, naming it (Texaco) as the unit operator. The effect of David L. Dooley's entering into this Operating Agreement with Texaco was one of the main issues in the present quiet title action, commenced by the Elmer Hall heirs, in the trial court early in 1961, after the C. K. Hall Unit well was completed as a commercial gas producer from the upper Morrow Sand, on November 6, 1960, and the Cor-

poration Commission had entered an order on December 16, 1960, establishing 640-acre drilling and spacing units for this new common source of supply.

In the pleadings Texaco (which the Hall heirs' petition named as a defendant in this case) filed, it revealed (in substance) that communitization of all mineral interests in Section 21, under the Corporation Commission's spacing order and the plan of distribution of the C. K. Hall Unit's production contemplated in the operating agreement, would make 3.125% of the lessees' share of said Unit's total production attributable to Dooley's (claimed) interest.

Viewing Texaco's answer, cross-petition and "cross claim" as a whole, it may be said that it did not rely upon resisting the claim of the Hall Heirs to all of the landowners' ⅛th mineral interest under the quarter section (on the ground that the term royalty created in the Neal-Hall deed's reservation had expired upon the cessation of production in the No. 1 Kiser well) but that it merely took the position that if those plaintiffs' claims of title to the entire lessors' share of said quarter section's mineral estate were upheld, then the court should also uphold its oil and gas leases from them; and Texaco prayed that its title to the "working interest" in said mineral estate, or leasehold, be quieted.

In his answer to the Hall heirs' petition, Dooley relied upon the fact that the C. K. Hall Unit well was completed in September, before the No. 1 Kiser well was plugged on November 8, 1960, to continue the life of his lessor's (Johnson's) term royalty, and to support his lease interest, upon application of the principles adhered to in Isaacson, supra. In his answer to Texaco's Cross-Petition and "cross-claim", Dooley incorporated the allegations of his answer to the Hall heirs' petition, by reference, and further alleged that he "started negotiating with Texaco, Inc. in connection with" his lease interest as early as June 14, 1960, long before the Kiser No. 1 well was abandoned; that these negotiations culminated in the C. K. Hall Operating Agreement;

"that in view of the recognition by Defendant, Texaco, Inc., of this Defendant's leasehold interest, and because of the fact it owned the lease * * * referred to in its Cross-Petition and Cross-Claim, a fiduciary relationship existed between the Defendant, David L. Dooley and the Defendant Texaco, Inc., whereby it became the duty of the Defendant Texaco, Inc., to protect his said leasehold interest and participating working interest; and that should plaintiffs prevail herein said Defendant Texaco, Inc., is bound by * * * (the operating agreement) * * * and is estopped to deny the validity of said operating agreement and the 3.125% interest after payout on the Hall Unit No. 1 well attributable to this answering Defendant."

This case was tried by the court upon stipulated facts, and documentary evidence introduced, in accord with agreements reached at a pre-trial conference.

In the final judgment the trial court thereafter entered, in December, 1963, it upheld the title of the Hall heirs to the entire landowners' mineral interest in the SE¼ of Section 21, supra, and Texaco's title to the oil and gas leases it had obtained from them; and, among other things, said judgment released Texaco from any obligation to Dooley under the C. K. Hall Unit Operating Agreement, and enjoined him from asserting any right, title or interest by reason thereof.

After the overruling of his motion for a new trial, Dooley, sometimes hereinafter referred to as "appellant", perfected the present appeal on original record. He has dismissed this appeal as to the Hall heirs, however, thus removing from our consideration any question as to the correctness of said judgment in holding (in effect) that the term mineral interest of Dooley's lessor, Johnson, and Dooley's lease interest based thereon, were not kept alive, and subsisting, by the drilling and/or completion of the C. K. Hall Unit well.

The only issue submitted to us in appellant's brief, is the hereinbefore mentioned one pertaining to the effect of the C. K.

Hall Unit Operating Agreement and whether, or not, despite the failure of the title, upon which Dooley's lease was based, Texaco's entering into said Operating Agreement with him, nevertheless, obligated it to regard him as owning 3.125% of said Unit's lessees', or working, interest. The single assignment of error set forth in Dooley's initial brief is as follows:

"The trial court erred in canceling and annulling the Operating Agreement between Texaco, Inc., and David L. Dooley, contrary to the intent of the parties thereto at the time it was entered into, and contrary to an express provision thereof which was inserted for the purpose of forever settling the rights of the respective parties (,) whether Dooley's leasehold interest was valid or invalid."

To support its position that Dooley is not entitled to share in the C. K. Hall Unit's ownership, merely because it entered into the Agreement with him, as one of those who had purchased interests in leases on the Unit acreage, Texaco relies upon the printed portion of said Agreement (which was introduced in evidence), herein referred to as its section 2B—one of its 30 sections. The pertinent provisions of this part of the Agreement, just as they appear in it, are as follows:

"2. TITLE EXAMINATION, LOSS OF LEASES AND OIL AND GAS INTERESTS

* * * * * *

"B. Failure of Title:

"Should any oil and gas lease, or interest therein, be lost through failure of title, this agreement shall, nevertheless, continue in force as to all remaining leases and interests, and

* * * * * *

"(2) * * * *the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Unit Area by the same amount of the interest lost;* * * *

* * * * * *

(Emphasis added).

As showing that the above quoted printed provision was not intended to apply to him, Dooley calls our attention to the following provision that (before the Agreement was signed) was typed into the blank space left in the printed form for the purpose of adding a 30th section to the Agreement under the heading:

"30. OTHER CONDITIONS, IF ANY, ARE:"

The typing under said printed heading reads as follows:

"Notwithstanding *any* provision of this agreement to the contrary, David L. Dooley's proportionate part of the costs and expenses of drilling, testing, completing and equipping *the test well referred to in Paragraph 7* herein shall be advanced by the Operator, who shall be entitled to withhold and sell the production from said well attributable to the interest of David L. Dooley until 200% of same has been recovered, for itself, by Operator." (Emphasis added).

Texaco says that the above-quoted, typed, 30th section's provisions were added to the Agreement, because Dooley did not want to advance his proportionate part of the C. K. Hall Unit well's expenses, and that its sole and only purpose was to exempt him from having to comply with the Agreement's section 8, which, in pertinent part, reads as follows:

"8. COSTS AND EXPENSES

\* \* \* \* \* \*

"Operator, at its election, *shall have the right* from time to time *to demand and receive from the other parties payment in advance* of *their respective shares of the estimated amount of the costs to be incurred in operations hereunder* during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated costs, together with an invoice for its share thereof. Each such statement and invoice for the *payment in advance* of estimated costs shall be submitted on or before the 20th day of the next preceding month. *Each party shall*

*pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received.* If any party fails to pay its share of said estimate within said time, *the amount due shall bear interest at the rate of six percent (6%) per annum until paid.* Proper adjustment shall be made monthly between advances and actual cost, to the end that each party shall bear and pay its proportionate share of the actual costs incurred, and no more." (Emphasis added).

██ Dooley's attorneys' briefs (especially the initial one) refer to certain circumstances which they say were part of the situation leading up to the writing into the Operating Agreement of its hereinbefore quoted typewritten section, or paragraph, "30", on the basis of which they attempt to show that said paragraph was added to the Agreement as a sort of insurance to Dooley against his title failing, and to insure his entitlement to a 3.125% share of the lessees' part of the C. K. Hall Unit's production, irrespective of any such failure. Some of the circumstances, however, are not supported by the record, and they, and counsel's deductions therefrom, can therefore not be considered here. In an attempt to explain why the hereinbefore quoted wording of the Operating Agreement's section 2B(2) should not control over the inferences they seek to draw from the addition of section 30 to said Agreement, appellant's counsel argue that to have stricken 2B(2) (they refer to us as "the failure of title clause") and "modified the costs and expenses provisions, and changed any other provisions to meet the Dooley situation, would have destroyed the Operating Agreement from the standpoint of suitability for signature by other working interest owners in the unit." In our opinion, this argument is not convincing and fails to show why—if Dooley had been intended to be excepted from the operation of the provisions of the Agreement's section 2B(2)—the simple expression "except David L. Dooley" would

not have clearly and practically implemented such an intention.

Dooley's argument cites Koelmel v. Kaelin, 374 Ill. 204, 29 N.E.2d 106, in which Phillips Petroleum Company v. Eckroat, 173 Okl. 17, 46 P.2d 464 was cited. Both of these cases involve situations different from the one here, and are not in point. An obvious distinction between the present case and the Koelmel Case is that, in the latter, the "lesser interest" provisions of the principal lease there involved—which were in conflict with the new provision typed into that lease for the purpose of settling the controversy as to the lessor's title—were completely deleted from the lease's printed form.

The substance of Texaco's most pertinent argument is that the only purpose of adding the provisions of section 30 to the Operating Agreement was to relieve Dooley from advancing that part of the Unit's costs and expenses that the Agreement's other provisions would otherwise have obligated a lessee of his record interest to pay, and, at the same time, to furnish Texaco a consideration for "the gamble" it took in advancing such share of those costs for him, without assurance that the Unit would ever have been able to market sufficient production from the C. K. Hall well, to obtain reimbursement for this advancement out of the proceeds of said production. This argument appears to contain a reasonable and logical explanation for section 30 and its provisions. Although the hereinbefore quoted provisions of the Agreement's section 8 provide that advancement of the Unit's costs of development and operation, due the Operator, from the non-operating parties thereto, if not paid when due, would bear interest at the rate of 6% per annum until paid, and the Agreement's section 9 provided for the Operator to have "a first and preferred lien" on the interest of any such delinquent party, to secure payment of such sums, said section also provided:

"In the event of the neglect or failure of any non-operating party to promptly pay its proportionate part of the cost and expense of development and operation when due, *the other non-operating parties and Operator,* within thirty (30) days after the rendition of statements therefor by Operator, *shall proportionately contribute to the payment of such delinquent indebtedness* and the non-operating parties so contributing shall be entitled to the same lien rights as are granted to Operator in this section. Upon the payment by such delinquent or defaulting party to Operator of any amount or amounts on such delinquent indebtedness, or upon any recovery on behalf of the non-operating parties under the lien conferred above, *the amount or amounts so paid or recovered shall be distributed and paid by Operator to the other non-operating parties and Operator* proportionately in accordance with the contributions theretofore made by them." (Emphasis added).

It will thus be seen from the above that the Agreement did not *otherwise* provide the expeditious way for one party to advance another party's share of the Unit's costs and expenses, that section 30 provides; nor did other sections provide the reward, to the advancing party, for taking any risk involved therein, that section 30 provides.

 Courts in this jurisdiction are bound, by the mandate of Tit. 15 O.S. 1961, § 157, to construe the whole of each contract *together,* and to *give effect to every part thereof,* if reasonably practicable. In Principle Films v. Wichita Mountains Easter Sunrise Service Assn., Okl., 288 P. 2d 734, we held:

"The intention of the parties must be deduced from the entire agreement and *every provision must be construed so as to be consistent with every other provision if possible,* and *that construction adopted which gives effect to every part of the contract."* (Emphasis added).

Giving the Operating Agreement the interpretation contended for by Dooley would give no effect to the hereinbefore quoted "failure of title" provision of section 2B(2), supra, as to him.

We are aware of our duty, under Tit. 15 O.S.1961, § 167, to disregard printed parts of a contract that are repugnant to the written parts, and, of our duty, under Tit. 15 O.S.1961, § 170, to interpret contracts "most strongly against the party who caused the uncertainty to exist. * * *" But, reasonably assuming that Texaco was the party who furnished the Operating Agreement in question, and assuming, without deciding, that it was the party who "caused the uncertainty (here in litigation) to exist * * *", we find, on the face of said Agreement, no repugnancy, nor conflict between, its section 2B(2) and 30, and no ostensible uncertainty created thereby. In such a situation, there is no reason or justification for us to look elsewhere than the written Agreement in resolving this controversy; and, if there were, the record in this case furnishes no basis for such an investigation. In this connection, see Frensley v. White, 208 Okl. 209, 254 P.2d 982, Continental Supply Co. v. Levy, 121 Okl. 132, 247 P. 967, and Romans v. Shannon, 80 Okl. 199, 195 P. 298.

While it may be that Mr. Dooley executed the subject Operating Agreement under the impression that it assured him of a 3.125% interest in the Unit, regardless of whether or not his lease title later failed, we find insufficient basis in the Agreement itself for such an impression; and no proof that said instrument was drafted, or signed, with the intention of assuring him of having such an interest, regardless of later title developments, was introduced at the trial. The fact that such an interest was referred to in the Agreement, as the portion of the Unit's ownership attributable to him on the basis of his lease, is not of particular significance. An arbitrary basis for such fractional tabulation must be selected before such an agreement can be entered into. We think it generally recognized that the recorded leases on the land, encompassed by such a Unit, comprise the basis usually tentatively selected for such tabulations and/or computations.

As we have found the judgment of the trial court neither contrary to law, nor clearly against the weight of the evidence introduced, and facts stipulated, at the trial, said judgment is hereby affirmed.

All the Justices concur.