**WILLIAM B. TANNER COMPANY, INC., Plaintiff,**

v.

**PLAINS BROADCASTING COMPANY, INC., d/b/a Radio Station KGYN, Defendant.**

Civ. No. 79–241–W.

United States District Court, W. D. Oklahoma.

March 26, 1980.

James H. Bellingham, McClelland, Collins, Bailey, Bailey & Manchester, Oklahoma City, Okl., Albert G. McLean, Picard, Caywood, Lucas & Watson, Memphis, Tenn., for plaintiff.

W. Keith Rapp, Howard & Rapp, Tulsa, Okl., for defendant.

LEE R. WEST, District Judge.

## I. FINDINGS OF FACT

Plaintiff, William B. Tanner Company, Inc. (herein Tanner), commenced this diversity action against Plains Broadcasting Company, Inc., d/b/a Radio Station KGYN (herein KGYN) in this Court claiming that Defendant owes Plaintiff a total of 6,161 one-minute spots to be aired on its radio station with a total fair market value of Thirty-One Thousand Eight Hundred Eighty-Three and 18/100 Dollars ($31,-883.18). Tanner is a Tennessee corporation which provides promotional advertising and other services for use by radio stations throughout the country on an exchange-and-barter basis.[1] KGYN is an Oklahoma corporation doing business as a licensed radio station in Guymon, Oklahoma.

In its complaint, Tanner claimed that it had provided Defendant with an Instant Library Service package under four contracting periods for which it had not received full compensation. The four contracting periods span the years 1964–1967, 1967–1970, 1970–1973, and 1973–1976. Under these agreements, Tanner was obligated to furnish various promotional materials to KGYN in return for cash payments and a specified number of one-minute spot announcements.

A "spot" is a segment of radio time sold for advertising purposes. Once Tanner has acquired spots from a radio station, it then resells them to its advertising clients. The contracts in issue purported to grant Tanner a large number of one-minute spots which were to be "valid until used". It is undisputed that KGYN paid Tanner the requisite cash payments for each of the four contracting periods, and thus only the unused spots are alleged by Plaintiff as due and owing under the contracts.

Under the 1964–1967 contract between Plaintiff and Defendant, signed June 19, 1964, Defendant agreed to pay Plaintiff the sum of One Thousand Eight Hundred Eighty-Six and 40/100 Dollars ($1,886.40) in cash and provide Plaintiff with 2,340 radio airtime one-minute spots. Paragraph 4 of the contract stated, inter alia: "These spots are preemptable and since they are considered partial payment for service(s) received, they are to be valid until used." Paragraph 10 of the contract stated that

---

1. Plaintiff is the successor to all rights, title and interest of Mars Broadcasting, Inc., and Pepper and Tanner, Inc. Plaintiff maintains no offices or warehouses in the state of Oklahoma and none of its employees reside within the state. Its business is solicited in the state of Oklahoma by salesmen who receive direction from the home office in Memphis, Tennessee. All contracts solicited from Oklahoma radio stations have to be approved by the home office. The merchandise, goods, and services rendered by Plaintiff to Oklahoma radio stations are shipped from Memphis, Tennessee.

the lease was to begin on September 1, 1964, and to continue for 156 weeks (three years). The lease would be extended for another three-year period on the same terms unless written notice was given by either party sixty (60) days prior to the termination date. In addition to the above mentioned clauses which were a part of a standard printed form that Tanner prepared and provided radio stations, there was an additional typed-in provision which gave KGYN the right to cancel the contract after the first year or the second year, by written notification to Tanner of their intent, accompanied by a short-rate penalty payment which would have been Two Hundred Forty Dollars ($240.00) for a two-year cancellation and One Hundred Twenty Dollars ($120.00) for a one-year cancellation. It further provided that if the contract was cancelled at the end of the third year then all customized station identification jingles were to become the property of KGYN without further cost. This contract was never formally cancelled in writing as was required by paragraph 10; however, a new contract was entered into between the parties on June 15, 1967. The new contract was a deliberate and formalized agreement including the same, or similar, subject matter as the 1964 contract and was intended as a substitute agreement. See, *Restatement of Contracts* § 419.

The second contract between Plaintiff and Defendant stipulated that Defendant agreed to pay Plaintiff the sum of One Thousand Nine Hundred Forty-Four and 00/100 Dollars ($1,944.00) in cash and provide Plaintiff with 2,340 radio airtime one-minute spots. Paragraph 2 stated, *inter alia*: "These spots are preemptable, and since they are considered payment for service(s) received, they are to be valid until used." Paragraph 8 of the 1967 contract stated that the lease would begin on September 10, 1967, and would continue for three years. The lease would be extended for another three-year period on the same terms unless written notice was given by either party sixty (60) days prior to the termination date. At the termination of the contract, KGYN was to send back to Tanner all of the license services.

This second contract was automatically renewed for two additional contracting periods, *i. e.*, 1970–1973 and 1973–1976. On August 4, 1976, Defendant gave notice to Plaintiff of its cancellation of the contract, effective September 20, 1976. Plaintiff on August 17, 1976, accepted Defendant's cancellation on the effective date.

At the time of cancellation, all of the requisite amounts of cash Defendant had been required to pay Plaintiff by the contract terms had been fully paid. During the 12-year time span of the four contracting periods (1964–1976), Defendant had obligated itself to provide to Plaintiff a total of 9,360 one-minute spots. Plaintiff had actually requested and Defendant had made available for Plaintiff's clients a total of 3,199 one-minute spot announcements. Plaintiff therefore concludes that Defendant still owes it 6,161 one-minute spot announcements as a result of the unused spot time. When Plaintiff made a demand upon Defendant in August 1977 to use some of these one-minute spot announcements, Defendant refused to make such time available free of charge. Plaintiff considered this refusal by Defendant to be a breach of its contractual duties, and Plaintiff instituted this action on March 1, 1979. Plaintiff asserts that the fair market value of the 6,161 one-minute spots at the time of the breach was Five and 37/100 Dollars ($5.37) per spot for a total value of Thirty-One Thousand Eight Hundred Eighty-Three and 18/100 Dollars ($31,883.18). At trial, Plaintiff reduced this amount slightly by giving Defendant KGYN credit for 40 ± one-minute spots. For the reasons indicated below, this numerical disparity is unimportant in the Court's assessment of damages.

## II. CONCLUSIONS OF LAW

### Procedural

■ The Court must first concern itself with the procedural problem raised by Defendant that Plaintiff is "engaging in or transacting business" within the State of Oklahoma to come within the purview of 18

O.S. (1971) § 1.201(a) which bars a party from bringing and maintaining an action in the courts of Oklahoma without first obtaining from the Secretary of State either a charter to do business in the state of Oklahoma as a domestic corporation or a certificate of domestication as a foreign corporation. The Tenth Circuit in *Wilson v. Williams,* 222 F.2d 692, 697 (10th Cir. 1955), and *Metropolitan Paving Co. v. International Union of Operating Engineers,* 439 F.2d 300, 307 (10th Cir. 1971), *cert. denied,* 404 U.S. 829, 92 S.Ct. 68, 30 L.Ed.2d 58, stated that it was the duty of the United States Courts in diversity cases to see that foreign corporations comply with a state's domestication statute as a condition precedent to the maintaining of an action in their federal courts as well as state courts.

Having duly considered the relevant case law, this Court finds that Plaintiff's contractual relationship with Oklahoma radio stations, which includes providing goods, merchandise and services to these stations does not exhibit the sort of localization or intrastate character to subject it to 18 O.S. (1971), § 1.201(a). Plaintiff's contacts with the state of Oklahoma, including those with the Defendant herein, were at all times a mere incident to transactions in interstate commerce and are protected by the commerce clause of the United States Constitution from the requirement of the State of Oklahoma that the Plaintiff domesticate or otherwise qualify in order to enforce legal rights incident to such commerce. *Allenburg Cotton Co. v. Pittman,* 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974); *Riblet Tramway Co. v. Monte Verde Corp.,* 453 F.2d 313, 318 (10th Cir. 1972); *Baker and Company of Florida v. Preferred Risk Mutual Insurance Co.,* 569 F.2d 1347, 1351 (5th Cir. 1978).

### Substantive

Plaintiff's legal argument is simply that the term "valid until used" which appeared in each contract meant that the Plaintiff retained the right to utilize such air time upon demand and that such right did not expire with the termination of the various contracts. This interpretation of the language requires an assumption that spot announcements during a previous contracting period were "rolled over" and that "Tanner's right to use the spots could run indefinitely—even beyond the length of the contract." *William B. Tanner Company v. WTTI Broadcasters, Inc.,* 139 Ga.App. 115, 227 S.E.2d 905, 907 (1976). This Court cannot agree with such an interpretation of the contract.

The Court of Appeals of the state of Washington was called upon to review a lower court's decision where the lower court had interpreted this same clause. *Pepper & Tanner, Inc. v. KEDO, Inc.,* 13 Wash.App. 433, 535 P.2d 857 (1975). The trial court had held that since the contract contained no time for performance, it would infer that this same plaintiff had to use its broadcasting spots within a reasonable time. In the *KEDO* case, there was only one five-year contract in issue. The trial court divided the 2,600 spot obligation set by the contract by the five-year duration and found that Pepper & Tanner was required to use 520 spots per year, thereby ruling that the total amount of spots had to be used evenly over the five year term of the contract. There, the defendant had three years remaining on the five-year contract. Since Pepper & Tanner had not used any of its spot announcements for the first two years, the trial court found that those 1,040 spots were lost. It entered judgment for 1,702 spots and required Pepper & Tanner to use these spots at the rate of 520 per year for the next three years or forfeit them. On appeal Pepper & Tanner contended that the contract was not silent as to the time for performance, and that the Court did not impose a reasonable time for completion of the contract. The Washington Court of Appeals affirmed the lower court's judgment stating:

"Where a contract is silent as to duration or states time for performance in general and indefinite terms, the court is to impose a reasonable time. A reasonable time is to be determined by the nature of the contract, the positions of the parties, their intent, and the circumstanc-

es surrounding the performance . . . The language of the contract in the case at bar—"valid until used"—allows for potentially infinite duration of the contract. Since *KEDO* can perform only if the spots are requested, the time for performance is completely within the control of Pepper. The trial court concluded that *KEDO* should not be expected to have the contract continuing indefinitely and we agree.

"In the first place, there was a contractual basis for fixing five years as the contemplated maximum period for performance by *KEDO*. The spots were part of the total contract consideration to be paid. The other bargained-for consideration was tied to rental payments which were to run for a 5-year period. Consequently, the "valid until used" provision could properly have been construed to be subject to the 5-year term concerning the rental payments.

. . . . . .

"The non-preemption element of the contract also furnishes a sound and proper basis for the court's ruling that the spots were intended to be used, if at all, on a regular basis. It stands to reason that preemption would be required if Pepper were to wait 4 years and then demand the 2,600 spots during the final year of the term. Therefore, the ruling that the spots which had not been ordered during the first 2 years of the term were lost, and the requirement that *KEDO* utilize the 1,720 remaining spots at the rate of 520 per year appears a reasonable interpretation of the contract.

"We conclude that the trial court's ruling was correct, either on the basis of interpreting an ambiguous contract reasonably in light of the practicalities involved, or on the reasonable time rule stated above." (citations omitted). 535 P.2d at 859.

It is not often that the Court is blessed with such persuasive precedent.[2] In the *KEDO* case, Tanner sued on the same theo-

---

2. This Court also found two other cases where Tanner had sued for the value of unused spots following cancellation of a contract leasing its services. In *William B. Tanner Co., Inc. v. WIOO, Inc.*, 528 F.2d 262 (3rd Cir. 1975), the Court of Appeals reviewed a Pennsylvania District Court's decision which granted Tanner the value of unused spots as relief for the radio station's breach of contract. The Third Circuit reversed the lower court and found that Tanner had not proved damages with "reasonable certainty". It should be highlighted, however, that Tanner and WIOO radio station had entered into five different licensing contracts over a period of years. The District Court had dismissed all claims against WIOO except as to the fifth and last contract which the radio station had anticipatorily breached, as Tanner had "unreasonably delayed enforcement" of the earlier contracts. While Tanner did not appeal the dismissal of spot obligations the radio station allegedly owed it for the first four completed contracts, the Third Circuit tacitly approved of the severance of any claim to the completed contracts stating that unused spots under the four completed contracts were no longer enforceable by a court. 528 F.2d at 269 n.10. Thus, the Third Circuit ruled that the only relief that was available to Tanner, aside from the proof of damages problem, was for the value of the spots under the repudiated contract whose lease term had not expired. In the instant case, of course, there were four contracts and they had all run the full term of years without a breach, so there is no reason to award damages as there was in the Third Circuit case.

In the second case, *William B. Tanner Co. v. WTTI Broadcasters, Inc.*, 139 Ga.App. 115, 227 S.E.2d 905 (1976), the Court of Appeals of Georgia had to decide whether Tanner was entitled to spot announcements allegedly due it under a seven year contract it had with radio station WTTI when the station cancelled the lease after only five years. The contract, in addition to containing the standard "valid until used" clause, also contained a typed-in provision which stated that "Station [WTTI] retains the right of cancellation after three years, upon 60 days notice in writing and payment of $150 short-rate". The trial court ruled that the latter typed-in cancellation provision not only cancelled the radio station's obligation to make further cash payments, but it also cancelled any obligation the radio station might have had to provide future spot announcements under the "valid until used" clause. The Court of Appeals of Georgia affirmed the trial court's judgment, holding that it was reasonable to apply the cancellation provision to the entire contract. Thus, the Georgia Court of Appeals, like this Court, read the contract as a whole and determined that it was "reasonable" to limit Tanner's right to use spots to the radio station's concomitant use of Tanner's leasing services. 227 S.E.2d at 907.

ry concerning the spots being "valid until used" as it does before this Court.

■ An important distinction should be made between the two cases in that Tanner's contract with KEDO still had three years to run. In the instant case, the Court need not concern itself with deciding the efficacy of prorating the spots on an annual basis since defendant KGYN terminated its agreement with Tanner at the end of a contracting period. Nonetheless, the same practicalities the Washington Court examined before ruling that Tanner had to make regular use of the spots within the contract period applies to a situation where it is urged that the spots outlive the termination of the contract. Mr. T. M. Rayburn, General Manager of Plains Broadcasting Company, testified that KGYN radio station could not possibly provide the 6,161 spots allegedly owed Plaintiff in any one year and indeed it would take many years before the spots could be utilized. Since the contracts in question state that Plaintiff cannot preempt the advertising for KGYN's regular customers, it stands to reason that the contract mathematics considered in light of the advertising realities support a conclusion that the spots were to be used, if at all, in conjunction with each three-year term period of performance and were not to be carried over ad infinitum.

■ Even more important is this Court's agreement with the Court of Appeals of Washington and Georgia that reading the contract as a whole[3], the meaning behind the contract term "valid until used" is am-biguous. One provision allows termination of the contract thereby releasing any obligation to provide rental services or make rental payments while another provision permits an indefinite right to use spots.

The ambiguity is demonstrated by the parties' own divergent response to the second contract's cancellation. Following the cancellation, KGYN treated the entire contract as cancelled as indicated by its letter of August 4, 1976, and its refusal to honor any of the unused spots it allegedly owed Tanner. While KGYN did air spot announcements for Tanner after the cancellation, the station provided these spots in return for Tanner's paying the going rate per spot.

Tanner's interpretation of the "valid until used" provision is that all of the broadcast spots (9,360) were earned and due prior to the cancellation of the last contract and that there were 6,161 unused one-minute broadcast spots owed it as of the date of cancellation. Tanner believes that it had the right to call on KGYN to run these unused spot announcements for an indeterminate time thereafter.[4]

■ "The contract was a standard form contract prepared by Tanner, therefore, any contradictions therein must be resolved against Tanner." *William B. Tanner Co. v. WTTI Broadcasters, Inc., supra,* 227 S.E.2d at 907–908. See, *King Stevenson Gas & Oil Co. v. Texam Oil Corp.,* 466 P.2d 950, 954 (Okl.1970). Construing the contract against Tanner, the Court must conclude that Tan-

---

**3.** See, *Dooley v. Cordes,* 434 P.2d 289, 294 (Okl.1967), quoting *Principle Films v. Wichita Mountains Easter Sunrise Service Assn.,* 288 P.2d 734, 738 (Okl.1955). ("The intention of the parties must be deduced from the entire agreement and *every provision must be construed so as to be consistent with every other provision if possible, and that construction adopted which gives effect to every part of the contract.*")

**4.** This would be true even though a one-minute spot announcement at the time of the original contracting was worth approximately $2.73 and that same spot announcement by 1979 was worth approximately $7.20 and constantly increasing in value. Since Tanner could demand the spots at any future time, KGYN could not

have contemplated the total contract consideration it was giving in return for the plaintiff's license services under the 1964, 1967, 1970, and 1973 contracts. Cf. *William B. Tanner Co., Inc. v. WIOO, Inc., supra,* 528 F.2d at 271–272 where the Third Circuit held that the value of these unused spots was too speculative to award damages. While this Court does not find that Tanner has failed to prove damages with "reasonable certainty", it is interesting to note our agreement with the Third Circuit that the profits Plaintiff would have received from the future sale of the spots is an unknown factor and that there is the possibility that Tanner might never have had customers for all of the spots.

ner's right to use spots was limited to a reasonable time,[5] that being the period of the contract itself. Thus, the "valid until used" provision is to be construed subject to the three-year durational term concerning rental services and rental payments. The time for performance by KGYN for all four contracts has passed and Tanner has thereby forfeited all unused spots. Accordingly, the Court need not address the statute of limitations raised by Defendant.

Judgment for Defendant including reasonable attorney's fees. 12 O.S. (1971) § 936.

---

**5.** Courts universally read into contracts that are ambiguous or silent as to time, an obligation of payment within a time "reasonable" in the context of the transaction and circumstances of the parties. What is reasonable is a question of fact. *Williston on Contracts*, Jaeger 3rd Edition, Section 40; *Hofmann v. Sullivan*, 599 P.2d 505, 508 (Utah 1979); *Ferris v. Jennings*, 595 P.2d 857, 860 (Utah 1979).