**HBOP, LTD., Appellee,**

v.

**DELHI GAS PIPELINE CORPORATION, Appellant.**

**No. 54040.**

Court of Appeals of Oklahoma, Division No. 2.

Feb. 16, 1982.

Rehearing Denied April 5, 1982.

Certiorari Denied May 24, 1982.

Released for Publication by Order of Court of Appeals May 28, 1982.

Thomas T. Rogers, Robert J. Emery & Associates, Oklahoma City, David McCall, Counsel, Delhi Gas Pipeline Corp., Dallas, Tex., Morris Flynn, Oklahoma City, for appellant.

William Pannill, Gary Catron, Pannill & Hooper, Houston, Tex., Carl Michael Smith, Lawrence, Smith & Harmon, Oklahoma City, for appellee.

BOYDSTON, Presiding Judge.

Gas purchaser appeals from judgment cancelling gas purchase contract and awarding $150,000 damages allegedly caused by Purchaser's neglecting to "ratably" take gas produced from split-stream wells. Petition alleged Purchaser failed to buy gas ratably with other purchasers from the same wells which resulted in offset drainage.

The suit is for contract cancellation and damages and is conceded to be an

action in equity. We are constrained to apply ordinary principles of contract construction and compare and harmonize all terms of the contract to determine the intent of the parties. 15 O.S.1971 § 154; *Dooley v. Cordes, Okl.,* 434 P.2d 289 (1967). All parts of the contract are to be given full effect without straining interpretation, ignoring part or adding provisions contrary to the intent of the parties. 15 O.S.1971 § 166; *Simmons v. Fariss,* Okl., 289 P.2d 372 (1955); *Cities Service Oil Co. v. Geolograph Co., Inc.,* 208 Okl. 179, 254 P.2d 775 (1953). The court is without authority to permit a party to amend or explain contract terms by parole unless its terms are ambiguous. *James Talcott, Inc. v. Finley,* Okl., 389 P.2d 988 (1964).

■ With these standards in mind, we are required to affirm the trial court's decision unless the judgment is clearly against the weight of evidence or contrary to the law and established principles of equity. We have reviewed the record, find no evidence of breach of contract or grounds for cancellation and reverse.

## PRELIMINARY STATEMENT

■ This complex legal problem arises from a gas marketing technique whereby working interest owners market gas separately, creating what is known as "split-stream" production. Rather than sell all production to a common purchaser—for various economic reasons—the owners take their proportionate share of gas "in kind," marketing it independently of one another.

This system always creates problems of "imbalance" between owners because their various buyers seldom, if ever, take the same quantity of gas. Consequently, net well reserve equities must eventually be balanced. Balancing is legally enforceable between owners by cash settlement (where well is depleted) or "in kind" by temporarily allowing the under-produced owner to take more than his usual share of gas, where reserves permit.

Reserve equity balancing is a common, inherent, vexatious accounting problem between split-stream owners. *Beren v. Har-*
*per Oil Co.,* Okl.App., 546 P.2d 1356 (1975); *See* Niebrugge, *Oil and Gas: Production Imbalance in Split Stream Wells—Getting Your Fair Share,* 30 Okla.L.Rev. 955 (1977).

### I

Plaintiff HBOP, LTD., is a partnership whose general partner is Hoover & Bracken, Inc. Defendant is Delhi Gas Pipeline Corporation. HBOP is one of several principle working interest owners who own five valuable gas wells in Roger Mills County. The wells are located in the West Cheyenne Field and are conceded to be at least 20-year producers having vast reserves.

HBOP contracted with Delhi to sell all its production from these wells on March 21, 1977, for a term of 20 years. Pertinent parts of the contract deal with the "quantity of purchase" and "ratable" clauses.

In particular, Delhi agreed to "take or pay" HBOP's gas based on a formula tied to the well's allowable production. Paragraph 4.1 of the contract provides:

[B]uyer agrees to purchase . . . or to pay for if available but not taken, a quantity of gas equal to the sum of the Daily Contract Quantities herein specified.

Daily Contract Quantities (DCQ) is defined by Paragraph 4.2, as being:

Seller's pro rata share of 6000 MCF [thousand cubic feet] from each gas well completed on a 640 acre unit.

Paragraph 4.8 provides:

If at the end of any Contract Year, Buyer shall have failed to receive during such year the applicable Daily Contract Quantity . . . on any day or days during such Contract Year, Buyer shall pay for the remaining deficiencies as if taken.

The contract carefully defines the method of computing and crediting all aspects of the "take or pay" feature of the contract. It provides an annual accounting formula to be used in determining whether Delhi has taken its quota of gas. If it has not, Delhi must then pay for any deficiency.

HBOP based the entire suit on its interpretation of Paragraph 4.4 which is the "ratable" clause. It provides:

Buyer agrees to keep Seller ratable with respect to its purchases of gas and with respect to the purchases of gas by others from wells completed in the same reservoirs in which Seller's wells are completed.

HBOP urged, and the trial court ruled, Paragraph 4.4 requires Delhi's minimum purchase obligation to be measured by the maximum purchases of others and that the wells are to remain continuously balanced—on a month-to-month basis.[1]

The contract allowed Delhi 60 days to commence purchases. Large imbalances existed between the other owners and HBOP at the time the contract was executed; these increased before Delhi went on stream near the end of May, 1977.

By December, 1977, only seven months into the first contract year, HBOP made demand on Delhi to take more gas and correct the unit (six wells) production imbalances which were claimed to be increasing in favor of the other working interest owners.[2] There followed several months of correspondence wherein Delhi responded that the current gas glut prevented them from increasing gas purchases.

In mid-1978, HBOP filed suit against Delhi in federal court. After that action was dismissed, this suit was filed in the District Court of Roger Mills County, alleging:

1. [P]urchasers other than Defendant are taking gas volumes at a rapid rate and is thus drawing down the reservoir's gas supply ... [which drainage has] caused Plaintiff to lose its gas reserves in the amount of $500,000.... [later amended to 1.3 million dollars];

2. Said breach ... will continue ... in the future ... and goes to the essence of the contract ... [therefore HBOP] is entitled to cancellation of its contract with Defendant; and

3. [HBOP] is entitled to ... reasonable attorney's fees.

## II

Trial court heard two days testimony, which included proof that the five split-stream wells were indeed imbalanced. The problem was magnified by a temporary sag in the market during 1977–78 which decreased intrastate demand. It was admitted HBOP was out of balance with its co-working owners when the contract was signed because the others commenced gas sales earlier. The parties' accounting varied little regarding the imbalances between wells. It is undisputed these wells have immense reserves and, as one witness testified, could easily be balanced within a year under current market conditions existing at time of trial.[3]

1. Witness Bracken first testified Delhi is obligated to balance the wells and account on a *weekly* basis.

   Trial court found:
   Article 4.4. of the Contract, which governed "ratable taking" of gas by Defendant, as *explained or supplemented by the consistent oral agreements* between Plaintiff's representative Walters and Defendant's representative Walters and *explained* or supplemented by evidence of the usages of trade in the natural gas producing industry, *meant* that Defendant would purchase from Plaintiff on a *month-to-month basis* volumes of gas in the same proportion as the volumes of gas taken by other purchasers in the same field, including purchasers from the wells in which Plaintiff owned an interest, and under-takes of ratable taking would be required to be made up by the Defendant within a reasonable time and particularly if demand is made therefor,

and if not then made the contract would be cancelled. (emphasis supplied)
   Defendant breached the contract by refusing to take ratably and Defendant's breach substantially impaired the value of the whole contract, which was to assure Plaintiff of reasonably constant cash flow from the contract wells to enable Plaintiff to participate in other ventures in natural gas exploration, which is Plaintiff's principal business.

2. Most, if not all, of the imbalance is the same which existed at the inception of the contract. Delhi's uncontroverted proof shows a net *gain* of 328 MCF if pre-contract imbalance is subtracted.

3. HBOP is signatory to a complex balancing agreement between other owners and their operators. A survey of industry literature leaves little doubt reservoir equity balancing is, from a

At trial, inexplicably, HBOP abandoned its theory that Delhi's conduct permitted offset drainage;[4] accordingly, HBOP's proof is void of damages attributed to drainage.[5]

In short, HBOP pleaded one theory for cancellation and damages, then proved quite another. This shift in theory was necessary because it had not lost a single MCF of gas and Delhi had either "taken or paid" for all the gas it had contracted for. The unpled theory urged at trial was that Delhi contracted to "take or pay" for the agreed minimum, *plus* additional quantities measured by current purchases of others *plus* sufficient additional quantities to immediately retire pre-contract imbalances.

HBOP therefore construed the contract, via the "ratable" clause, to have *three separate* minimum purchase "take or pay" requirements. We find this to be a sophisticated interpretation in the extreme. Under HBOP's uncharitable accounting theories[6] and fanciful contract interpretation Dehli was in breach the day after it went on stream. For, even though swimming upstream against market forces beyond its control,[7] with the exception of a few MCF,

Delhi is charged only with failure to retire pre-contract imbalances.

### III

The judgment is based solely on witness Bracken's testimony. We find it to be impermissible, self-serving parole evidence which dramatically amends the contract terms. He testified he personally negotiated the contract; and, Paragraph 4.4 (the ratable clause) *actually* meant buyer is required to keep the wells in balance on a monthly basis.[8] It was very important to him, he testified, because HBOP needed a constant "cash flow." This evidence and its subsequent use as the basis of the judgment is erroneous for several reasons.

First, the contract is not ambiguous. Ordinary contract construction requires the "ratable" and "quantity" terms be harmonized to determine and give full effect to the intent of the parties.

We hold the ratable clause is *primarily* intended to promote field-wide conservation and prevent discrimination by pipeline companies among their current and potential customers. Delhi, by reason of its capacity as a pipeline, may not serve a gas field without offering its service ratably[9] to all producers in the same field.[10] Such a clause

---

practical standpoint, a "family affair" between working interest owners.

**4.** At one point the court observed quite accurately "[I]t [gas] is still down there."

**5.** Absent proof: (1) offset drainage exists; or, (2) "in kind" imbalance adjustment is impossible because of insufficient reserves, *and* Delhi somehow wrongfully caused that imbalance, *and* cash accounting between owners is fruitless because of bankruptcy, etc., we know of no theory in law or equity, outside a clear contractual undertaking, which should hold a purchaser accountable in damages for short-term imbalances to a split-stream producer. This is primarily an accounting problem between split-stream producers and their operator.

**6.** All its damages are based on proof that if Delhi had paid for the unused gas monthly, HBOP would not have lost the use of the funds. Its economist testified the loss of use of the cash amounted to more than $1.3 million. These "lost" sums were computed based on figures which include pre-contract imbalances. The economist never did explain how HBOP is

damaged by loss of opportunity to invest (interest earned on deposit) *plus* inflation. This possibly explains why the court awarded only $150,000 damages when HBOP's testimony attempted to establish damages in excess of $1.3 million.

**7.** Without provocation, the Department of Energy virtually embargoed intra-state gas during this period.

**8.** Bracken later recanted his "weekly" adjustment theory and conceded adjustments were subject to a "reasonable time."

**9.** Ratable means pro-rata. *Republic Natural Gas Co. v. State*, 198 Okl. 350, 180 P.2d 1009 (1947).

**10.** For example, the production unit, of which HBOP is part owner, even without this contract provision, may not demand the transmission of its gas to the exclusion of others, nor in discriminatory volumes. It would be surprising if Paragraph 4.4 or a similar clause were not in all pipeline contracts.

is generically statutory;[11] and, in this case, it is also contractual. It also has long-term *secondary* implications which indirectly affect Delhi's purchase volume and only consequentially affect HBOP's balancing problem. However, its application as a mandatory short-term minimum purchase standard is dubious.

Second, the court has arbitrarily altered the "time for performance" contract terms from annual to monthly. The written contract already has detailed provisions which carefully define the minimum daily quantity, the time for accounting and under what circumstances Delhi must "take or pay." These provisions clearly impose a duty of *annual* accounting and adjustment based on *daily* minimum quotas (DCQ).[12] The quotas are easily determinable because they are directly tied to allowables.

Bracken's version of Paragraph 4.4 is not only contrariwise to the written contract— it inflates the interpretation of one small, enigmatic paragraph to include sweeping, impossible-to-perform duties and ignores, or deletes altogether, six pages of contract terms specifically dedicated to the same subject. Moreover, it alters the contract accounting method, the time of performance and the quotas. It alters every material part of the contract.

■ Finally, Bracken's testimony, *inter se*, disqualifies itself. Final contract terms supercede pre-contract discussion and the subject is deemed to have been covered within the confines of the contract, where a matter has been specifically discussed during contract negotiations which culminate in a written contract. *Albert & Harlow,*

*Inc. v. Fitzgerald*, Okl., 389 P.2d 994 (1964). The deceptively irrelevant evidence regarding imbalances and Bracken's testimony "explaining" Paragraph 4.4 is critical to the judgment. We find both to be extraneous to the fundamental issues and the judgment to be erroneous.

## IV

■ The contract provision requiring Delhi to keep HBOP ratable does not impose a short-term duty requiring Delhi to resolve imbalances between working interest owners. It is a three-tiered, descending-priority obligation: (1) a continuous (life of the field) obligation to HBOP and others in the field to prevent offset drainage; (2) to retire pre-contract imbalances within a reasonable time, considering the remaining reserves and prevalent market conditions; and, (3) to cooperate with HBOP's operators over the term of the contract to keep HBOP ratable on current purchases between intra-unit wells and between owners within each well. The effect of the ratable clause on Delhi's "take or pay" obligation, if any, is incidental in the short term.

Taken in its best light, HBOP's evidence proved it was extremely disappointed because Delhi failed to *exceed* the Daily Contract Quantities (DCQ) established by the contract. This is not legal justification for the damages award and falls far short of a valid excuse for the harsh remedy of outright contract cancellation.

Judgment reversed, case remanded to trial court with instructions to enter judgment in favor of Delhi. We adjudge Delhi is entitled to recover attorney fees and costs incurred at trial and on appeal, the amount

11. 52 O.S.1971 § 23 provides:
   Every corporation ... exercising the right to carry or transport natural gas by pipe ... for hire ... shall engage in the business of purchasing natural gas ... shall purchase all the natural gas in the vicinity of, or which may be reasonably reached by its pipe lines ... without discrimination in favor of one producer or one person as against another ... it shall purchase and transport natural gas from each person or producer *ratably*, in proportion to the average production, and such common purchasers are hereby expressly

prohibited from discriminating in price or amount .... (emphasis supplied)
   Nationally, the Oklahoma legislature enacted the first such statute in 1913; it is designed to protect correlative rights.

12. Implicit in these terms is that Bracken's stated goal of "cash flow" is achieved. Specifically, HBOP is guaranteed its share of 6,000 MCF per day production from each of the five wells adjusted on an annual basis whether or not Dehli buys it. There is no allegation or proof the minimum purchase was not taken or paid.

to be determined by the trial court on proper hearing.

BACON and BRIGHTMIRE, JJ., concur.