JERRY CHAMBERS EXPLORATION, a Colorado General Partnership, and Blackbird Co., a Colorado General Partnership, Appellants,

v.

HEADINGTON PENN CORP., a Texas Corporation; Southwestern Energy Production Company, an Arkansas Corporation; Hamon Operating Company, a Texas Corporation; ABPS Energy, an Oklahoma Corporation; RB Operating Company, an Oklahoma Corporation; Wagner & Brown, a Texas General Partnership; George W. Price, an individual and Gerald Adkins, an individual, Appellees,

and

Melinda Price, an individual, Additional Defendant/Appellee.

No. 81551.

Court of Appeals of Oklahoma, Division No. 1.

March 8, 1994.

Rehearing Denied May 3, 1994.

Certiorari Denied July 6, 1994.

---

W. Davidson Pardue, Jr., Carl Michael Smith, Oklahoma City, for appellants.

John R. Morris, Laurence M. Huffman, Oklahoma City, for appellees, Headington Penn Corp.; Hamon Operating Company and the Successor Trustee of the Price Oil & Gas Investments Trust.

Patricia D. Horn, Donna N. Blakely, Oklahoma City, for appellee, Southwestern Energy Production Co.

R. Bruce Kerr, Gregory L. Mahaffey, Oklahoma City, for appellee, Wagner & Brown.

## OPINION

HANSEN, Chief Judge:

Appellants, Jerry Chambers Exploration Co. and Blackbird Co., seek review of the trial court's order which sustained Appellees' Motion for Summary Judgment. Appellants brought this action against Appellees, Headington Penn Corp., Southwestern Energy Production Company, Hamon Operating Co., Wagner & Brown, George W. Price, Gerald Adkins and Melinda Price, (collectively referred to as HPC), for breach of contract and an accounting. The parties are all non-operating working interest owners in three gas

wells which are located in Section 1, Township 14 North, Range 14 West, Custer County, Oklahoma.

Appellants brought this action seeking to "cash balance" its gas account on the Carmen 1 gas well in Section 1. Appellants are underproduced on the Carmen 1 well and HPC is overproduced on the Carmen 1 well.[1] Appellants allege the Carmen 1 well has permanently ceased production and under the terms of the cash settlement provision of the joint operating agreement (JOA), they are entitled to a cash settlement of over $250,-000.00. All parties in this action have working interests which are subject to a JOA which was executed in March, 1978.[2]

HPC sought summary judgment, maintaining this action was prematurely brought because the Carmen 1 well has not "permanently ceased production" or, if the well is determined to have ceased production, because the other two wells in the unit are still producing. HPC maintains Appellants are not entitled to a cash settlement until all production *from the unit* ceases. Appellants stipulate on appeal that at least one well in the unit area was producing at the time of suit. However, they argue, the JOA does not require production to cease from the entire unit before they can cash settle but that cash settlement should occur when *one well* has ceased production. The trial court granted HPC's motion for summary judgment without making any specific findings of fact.[3]

On appeal, Appellants argue the gas balancing/cash balancing language in the JOA is ambiguous and summary judgment is improper because factual issues remain regarding the intent of the parties to the JOA. HPC maintains the language is not ambiguous and that *unit* balancing was contemplated by the parties. The gas balancing provision is as follows:[4]

31.B *Gas Storage and Balancing Provision*

1. During the period or periods which any party hereto has no market for, or its purchaser is unable to take its share of gas, the other parties shall be entitled to produce each month one hundred percent (100%) of the allowable gas production assigned to the Unit Area by the appropriate governmental entity having jurisdiction, and each of such parties shall take its pro rata share. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own its share of the gas produced and shall be credited with gas in storage equal to its share of the gas produced, less its share of gas used in lease operations, vented or lost. *Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto monthly statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.*

---

1. Gas imbalances between working interest owners arise from a gas marketing technique whereby working interest owners market gas separately. Rather than sell all production to a common purchaser, the owners take their proportionate share of gas "in kind", marketing it independently of one another. *HBOP, Ltd. v. Delhi Gas Pipeline Corporation*, 645 P.2d 1042, 1044 (Okla. App.1982). This system creates imbalance between owners because the various buyers seldom take the same quantity of gas. *Id.* As a result, net well reserve equities must be balanced. "Balancing is legally enforceable between owners by cash settlement (*where well is depleted* ) or "in kind" by temporarily allowing the underproduced owner to take more than his usual share of gas, where reserves permit." *HBOP, Ltd.*, at 1044 (Emphasis added).

2. The parties, or their predecessors to the JOA, utilized A.A.P.L. Model Form Operating Agreement 610 (1956) as their JOA.

3. Appellees sought summary judgment basically arguing the JOA is not ambiguous. Appellants responded, asserting the JOA is ambiguous and attached evidentiary material in support of its position that the contract requires wellhead balancing. Because the trial court did not make specific findings, we do not know whether the trial court determined the contract was unambiguous or was ambiguous but resolved the ambiguity in favor of Appellees (which would have been impermissible on summary judgment).

4. The separate paragraphs of Section 31.B of the JOA are numbered for the purposes of this opinion only and emphasis has been added.

2. After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to twenty-five percent (25%) of each overproduced party's share of gas produced. If more than one party is entitled to the additional gas produced, they shall divide such additional gas in accordance with Unit participation.

3. *In the event production of gas permanently ceases prior to the time that the accounts of the parties have been balanced, a complete balancing shall be accomplished by a money settlement. Such settlement shall be based upon the average price received by each overproduced party for its share of gas produced and sold.*

4. At all times while gas is produced from the Unit Area, each party shall make appropriate settlement of all royalties, overriding royalty interest, and other payments out of or in lieu of production for which it is responsible, as if each party were taking or delivering to a purchaser its share, and its share only, of such gas production. Each party hereto agrees to hold each other harmless from any and all claims for royalty owners to whom each party is accountable.

Paragraph 1 authorizes other participants in the "unit area" to produce 100% of the *unit's* allowable in the event any other party cannot market its share of gas. Paragraph 1 also requires the Operator to maintain current accounts of the gas balances between the parties and to furnish monthly statements. The evidence attached to Appellants' response to the motion for summary judgment indicate gas balance statements and accounts are issued on a *per-well basis,* not on a unit basis.

"Unit Area" is defined in the JOA as "all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A"." The original exhibit A to the JOA describes all of Section 1, T14N, R14W, Custer Co., Oklahoma, as the land covered by the agreement. The JOA also defines the term "drilling unit". Drilling unit is defined as "the *area* fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Unit Area or as fixed by express agreement of the parties." [5]

Paragraph 2 of § 31.B is the provision allowing an underproduced party to make-up gas from an overproduced party. There is only one reference in the paragraph to unit participation: the provision which requires two or more underproduced parties to split the additional gas "in accordance with unit participation". Paragraph 3 provides for cash balancing of the *accounts* of the parties if "production of gas permanently ceases". As previously noted, Appellants have shown by uncontroverted evidence, that the gas balancing accounts in the unit are kept on a per-well basis. There is no language in Paragraph 3 which describes whether cessation of production must be on a wellbore basis or on a unit basis. Paragraph 4 requires each participant to settle its own royalty burdens at all times while gas is produced from the unit area.

 Whether a contract or conveyance is ambiguous so as to require extrinsic evidence to clarify the ambiguity is purely a matter of law for the court. *Ferrell Construction Company, Inc. v. Russell Creek Coal Company,* 645 P.2d 1005 (Okla.1982). However, where the meaning of an ambiguous contract is in dispute, evidence of extrin-

---

5. Appellees argue the absence of the phrase "drilling unit" in § 31.B indicates the parties intended cash settlement only on a unit basis. Drilling unit as defined in the JOA refers to an *area.* Whether the phrase "drilling unit" and "well" are synonymous and whether the absence of the phrase indicates an intent to cash settle on a *unit* basis are questions of fact to be determined by the trier of facts.

sic facts is admissible and construction of the contract becomes a mixed question of law and fact and should be submitted to the jury. *Altshuler v. Malloy*, 388 P.2d 1 (Okla.1963).

█ Generally, when a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone. 15 O.S.1991, § 155; *Altshuler v. Malloy*, 388 P.2d 1, 3 (Okla.1963). Unless fraud or mistake is involved, pre-contract negotiations and oral discussions are merged into, and superseded by the terms of the executed written agreement. *Mercury Investment Company v. F.W. Woolworth*, 706 P.2d 523 (Okla.1985). While parol testimony cannot vary, modify or contradict the terms of the instrument, it is admissible to explain the meaning of words when there is a latent ambiguity in the written text of an agreement. *Id.*; *HBOP, Ltd. v. Delhi Gas Pipeline Corporation*, 645 P.2d 1042, 1044 (Okla. App.1982).

Viewing § 31.B in its entirety and in relation to the entire JOA, we hold the cash balancing provision to be ambiguous. In sustaining Appellees' motion for summary judgment, the trial court interpreted the cessation of production entitling one to cash settlement to require a cessation of production from the entire unit. There is no language in the cash settlement provision which qualifies cessation of production as cessation of production *from the unit.* Indeed, the evidence submitted by Appellants shows the gas balance accounts and a party's overproduced/underproduced status is calculated on a per-well basis. Reasonable people could differ on whether the cash balancing provision requires a cessation of production from the unit or on a per-well basis. Accordingly, there are still material facts in dispute which make summary judgment inappropriate.

█ In ascertaining the intent of the parties to a contract, the court may examine the parties' acts and conduct regarding their construction of the agreement. *King–Stevenson Gas & Oil Company v. Texam Oil Corporation*, 466 P.2d 950 (Okla.1970); *Gillham v. Jenkins*, 206 Okla. 440, 244 P.2d 291, 294 (1952). Where the meaning of the terms used in a written contract is not clear, but the parties have construed and acted upon

the terms, such construction will be adopted even though the language of the contract may be susceptible of another construction. *Currey v. Willard Steam Service, Inc.*, 321 P.2d 680, 685 (Okla.1958).

█ Summary judgment is an appropriate method to reach final judgment where there is no dispute as to any material facts. *Hargrave v. Canadian Valley Electric Cooperative, Inc.*, 792 P.2d 50, 55 (Okla.1990). All inferences in the evidence must be taken in favor of the party opposing the motion. *Id.* A motion for summary judgment should be denied if the facts concerning any issue raised by the pleadings and affidavits are conflicting or if reasonable people, exercising fair and impartial judgment, might reach different conclusions from the undisputed facts. *Weaver v. Pryor Jeffersonian*, 569 P.2d 967 (Okla.1977).

If the trier of facts determines cash balancing is only available if production ceases on a *unit* basis, then Appellants' stipulation that at least one well in the unit was still producing at the time suit was filed is determinative of this action. If, however, the trier of facts determines cash balancing is available when production has ceased from any one well, then the trier of fact must determine whether the Carmen 1 well has "permanently ceased production" as required by the JOA.

The judgment of the trial court is REVERSED and this cause is REMANDED for proceedings consistent with this opinion.

JONES, P.J., and ADAMS, J., concur.